IN THE OREGON TAX COURT

Jan T. and Marsha M. BAISCH,
Robert and Mary Borghorst,
Michael T.H. and Ruth M. Brodeur,
Remy W. and Barbara F. Fulsher,
Richard F. and Mary J. Goos,
Ronald W. and Jean A. Harriman, Janice O. Hayslip,
Scott S. and Mary L. Hinsdale,
Jonathan H. and Karen C. Hoppert, Wayne C. Kaesche,
Thomas A. and Ginger L. Lorence,
Wallace V. and Joan McKay,
Douglas E. and Lois R. McQuown,
Vincent R. and Dorothy A. Molin,
Mrs. Hester H. Nau, Bianca Pastega,
Mario D. and Alma M. Pastega,
Richard A. and Yvonne Potter,
Craig J. and Diana L. Rolfing,
Leslie F. and Maryellen R. Stevens,
Alonzo P. and Marybeth P. Stiner,
Douglas M. and Betty J. Thompson
and Peter Barnhisel,
for the Estate of Charlie Woodstock

*v.*

OREGON DEPARTMENT OF REVENUE

(TC 3029)

Frank T. DUNN, Jr.
and Barbara Dunn

*v.*

DEPARTMENT OF REVENUE

(TC 3131)

Kevin O'Connell, O'Connell Goyak and DiLorenzo, Portland, represented plaintiffs.

Bonni C. Canary and Rochelle Nedeau, Assistant Attorneys General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered April 14, 1992.

**CARL N. BYERS, Judge.**

Plaintiffs are limited partners in Bakersfield Associates (Bakersfield), an Oregon limited partnership. Defendant adjusted each of the plaintiff's tax returns for the years 1982 through 1984. Initially, defendant adjusted the returns by reallocating partnership income and expenses. At the administrative hearing, defendant changed its position and viewed Bakersfield's purchase-leaseback transaction as a "sham" that should be disregarded for tax purposes. In its opinions and orders, defendant found the transaction a sham and plaintiffs appealed to this court.

The scenario in this case involves many of the same players as in *Allison v. Dept. of Rev.*, 11 OTR 431 (1990). As in that case, Messrs. Fuhrer, Dunn and Doerr were shareholders of F. D. & D. Realty Corporation, an Oregon corporation, which was, in turn, the general partner of Morgan

Financial Group, Ltd. (Morgan), an Oregon limited partnership. Pacific X-Ray Profit Sharing Trust was the sole limited partner of Morgan, entitled to 99 percent of the profits from Morgan. Messrs. Fuhrer, Dunn and Doerr were also partners in a general partnership, Fuhrer, Dunn & Doerr (FD&D), which was the general partner of Bakersfield.

Unlike *Allison*, here the scope of inquiry brings in other parties. RAI-Two, a wholly owned subsidiary of Realty Asset Group (RAG), was a company operated by Francis Darcy (Darcy). Darcy organized RAI-Two solely to acquire 13 net-leased properties. Darcy needed help financing the RAI-Two acquisitions. He proposed that plaintiff Frank Dunn, Jr.[1] put up $450,000 in exchange for which Dunn could have his pick of four of the 13 net-leased properties being acquired. Dunn agreed.

## THE PROPERTIES

The property involved consists of the four properties selected by Dunn. Each property is a separate commercial store; three are in California and one is in Colorado. The California properties are leased by Albertsons, Inc., a national grocery chain, and identified as (1) the Buena Park store, (2) Bakersfield store No. 649 and (3) Bakersfield store No. 643. The property in Lakewood, Colorado, is leased to Skaggs, a national drug chain.

The arrangements for all the stores are very similar. Albertsons and Skaggs constructed the buildings and sold the completed stores to investors, who financed the purchases with bank loans secured by mortgages. Albertsons and Skaggs then leased the properties back from the investors.[2] All four stores are leased under triple-net leases. Each lease provides for an initial term of 25 years, starting in December, 1973 and ending December 31, 1998. Each lease contains renewal options in five-year increments. The three California leases can be extended 30 years to December 31, 2028. The Colorado store lease can be extended to January 31, 2034.[3]

---

[1] Dunn appears to have acted as the agent of either F. D.& D. Realty Corporation, an Oregon corporation, or FD&D partnership.

[2] For clarity, these leases are referred to as user leases and the investors are referred to as investor-lessors.

[3] The Colorado store lease also contains an automatic one (1) month extension at the end of the initial term.

The court assumes such transactions were negotiated at arm's length. Defendant does not challenge the validity of the user leases. As explained below, the rents paid by the stores are not based on the fair market rental value of the properties. Rather, the sale-leasebacks are structured around the investment returns required by the investor-lessors. Darcy testified that the user leases involved here are "strong triple net leases." The investor-lessors have virtually no control over the property.

The sale-leaseback arrangements are handled on a secure basis. That is, rents are paid by the store tenants to an escrow which pays the underlying mortgagees directly. The investor-lessors receive only the excess rent amounts. Thus, there is little opportunity for the investor-lessors to disrupt or interfere with the security or the property. The total rent for all four stores was $22,755 per month. Of this amount, $19,136 was paid by the escrow to the underlying mortgagees to service the debts. This left $3,619 to be paid to the investor-lessors. (Referred to herein as excess user rent.) When the mortgages are satisfied the user lease rents diminish drastically.

## MORGAN'S PURCHASE

Morgan purchased title to the four properties subject to the existing user leases. Morgan's purchase price of $2,576,157 was paid as follows: $215,170 cash down payment, $264,000 in short-term notes and $2,096,987 by assuming the original nonrecourse notes secured by the mortgages. Thus, for $479,170 in cash Morgan obtained the right to receive $3,619 per month ($43,428 per year) in excess user rents. Morgan also became entitled, as titleholder of the properties, to any residual value which might exist when the leases terminate.

Defendant does not challenge Morgan's purchase price. The purchase was made in an arm's-length transaction and Morgan obtained real economic value for its purchase price. Defendant's witness, Reeder, calculated the net present value of the user rents, plus the residual land value to be received 30-plus years in the future, as $2,986,771.[4] However, plaintiffs claim that Morgan did even better. They claim

---

[4] It appears the witness failed to consider the last five-year option on one of the leases. According to the court's calculations, the correct net present value should be $2,687,644.

Morgan made a shrewd investment and obtained an interest with a fair market value greater than $4,000,000.

## THE BAKERSFIELD PURCHASE

The transaction being challenged is Bakersfield's purchase of the same four properties. On the same day that Morgan purchased the properties it sold them to Bakersfield for $4,350,000, or $1,773,843 more than Morgan paid. The terms of the purchase by Bakersfield were: A down payment of $198,250 cash, assumption of the short term notes in the amount of $264,000 and four real estate notes (later replaced by a single note) in the amount of $3,887,750.[5] The note payable to Morgan provided for interest at 18 percent from October, 1982, until December 31, 1984, and for 10 percent thereafter. The payment schedule provided for interest only of $20,000 per month until January 1, 1985, when the monthly payments would be $45,245.[6]

## THE BAKERSFIELD LEASEBACK

Simultaneously with its purchase, Bakersfield leased the property back to Morgan by "wrap" leases. These leases gave Morgan the right to use of the properties, subject to the user leases of the stores. In essence, Morgan retained the right to receive the excess rents from the user leases.

Although there is a separate wrap lease for each property, they all contain similar terms. Each lease provides for an initial term ending December 31, 2012, with three five-year options to renew. Even assuming all user lease options are exercised, the wrap leases all expire at least one year before the user leases (six years for the Colorado store).[7] The

---

[5] The court views the dates with some suspicion since it appears that some actions were taken before or after the dates of the documents involved. For federal income tax purposes, Bakersfield reported the acquisition date of all four properties as November 1, 1982. However, accumulated depreciation indicates that store No. 649 and the Buena Park property were actually acquired October 1, 1982.

[6] During the first two years, interest charges against the note greatly exceeded the payments of $20,000 per month. The excess interest was added to the principal. Due to compounding, interest charges rose from approximately $58,000 for December 1982, to approximately $75,000 for December 1984. Thus, the balance due on the note increased to over $5,000,000 before Bakersfield made any principal payments.

[7] The taxpayers submitted conflicting evidence. The signed sales agreement, which dealt with the four properties as a whole, states that the wrap lease for the Colorado store is subject to four five-year renewal options. The signed wrap lease

wrap leases require no payments for the first three months through January, 1983. Then, beginning with the fourth month and continuing through January 31, 1985, the total rent for all leases is $22,374 per month. Beginning February 1, 1985, the total rent increases to $47,970 per month.

## INVESTMENT CONSEQUENCES

In promoting Bakersfield, F. D. & D. Realty Corporation, an Oregon corporation, solicited limited partnership investors. There were 30 units offered at $28,000 each, for a total of $840,000. The $28,000 was payable in installments as follows: 1982 — $2,900; 1983 — $11,900; and 1984 — $13,200. The unpaid contributions drew interest at 15 percent, requiring an additional $2,921 per investor.

As represented in the offering summary, this investment offered the investors substantial tax benefits. Over the first 20 years (1982-2001) the investors would receive $18,479 in cash distributions and tax benefits equal to $45,761 (assuming a 55 percent tax rate). Although the projections show a taxable loss of $83,202, nevertheless, the investors would end up with $64,240 after-tax benefits. If those annual benefits were reinvested at nine percent, the cumulative after-tax benefit less investment would be $124,406.

If the investor remained a limited partner for 30 years (1982-2012), the offering represented that each investor would receive $29,270 in cash. During the same period, the investor would realize $46,837 in positive taxable income, which would result in a negative tax benefit of $25,761. Nevertheless, if the annual benefits were reinvested at nine percent, the cumulative after-tax benefit less investment would still be $228,629.

As noted in *Allison*, the beauty of the arrangement is in the interplay between the accrual method of accounting and the participation of a tax-exempt, profit-sharing trust. *See* 11 OTR at 434. Bakersfield reported its income on the accrual basis. Its obligation to pay interest accrued at 18 percent on the note for the first 26 months, which resulted in

---

agreement, which is specific to the Colorado property, states that the wrap lease is subject to three five-year renewal options.

large interest deductions. Additionally, depreciation deductions were $227,900 on an annual basis[8]. Not surprisingly, Bakersfield's total reported partnership losses were substantial: 1982 (2 months) — $142,112; 1983 — $736,434; and 1984 — $806,041.

Morgan also reported its income on the accrual basis. Since Morgan would report large amounts of income, the arrangement would seem to be to its disadvantage. However, Morgan's limited partner, the profit-sharing trust, received 99 percent of the income. Since the profit-sharing trust is exempt from income taxes, 99 percent of Morgan's accrued income became nontaxable.

■ Defendant claims the sale and leaseback arrangement between Morgan and Bakersfield was a sham transaction to create large tax deductions for the Bakersfield investors. Defendant's position rests on two basic arguments. First, Dunn controlled both Morgan and Bakersfield. Therefore, the sale and leaseback between the parties was not an arm's-length transaction and the purchase price was not a negotiated purchase price. The court agrees with defendant on this point. Plaintiffs do not seriously dispute the fact that Dunn controlled both entities.

As its second argument, defendant asserts there is no economic substance to the transaction between Morgan and Bakersfield. While defendant recognizes that the $2,576,157 Morgan paid for the properties was justified, it contends the $4,350,000 Bakersfield paid was not. Defendant believes the transaction was contrived to produce a tax shelter only and was motivated by tax avoidance.

**ISSUE**

■ The primary issue in this case is whether the sale and leaseback between Morgan and Bakersfield was a "sham" transaction. This requires the court to determine if there was a business purpose other than obtaining tax benefits and whether there was any economic substance to the transaction. *Rice's Toyota World, Inc. v. Commissioner*, 752 F2d 89, 91 (4th Cir 1985), *aff'g* 81 TC 184 (1983).

---

[8] This amount was reported for the 1985 tax years and later. Depreciation for 1982 through 1984 was reported at $217,046 on an annual basis.

## EVIDENCE OF FAIR MARKET VALUE

Plaintiffs emphasize that a major element of value for Bakersfield is the residual land value of the underlying real property. Upon termination of the user leases, Bakersfield is entitled to receive back the real property. The problem is that the user leases are long-term leases with extensive options. Plaintiffs readily acknowledge that at the end of the 30-plus years there will be little, if any, value in the improvements. As Mr. Dunn testified, the properties were selected in part because of their locations. That is, the investors expect large increases in the land values over the long term. Consequently, the investors expect the land to increase in value and become a major benefit to be received from the transaction.

Plaintiffs argue that Morgan's $2,576,157 purchase price was such a bargain that Bakersfield's purchase price of $4,350,000 was also a prudent buy. Plaintiffs claim Bakersfield immediately acquired an equity position in real estate far more valuable than $4,350,000. Ignoring that the Bakersfield note balance increased to over $5,000,000, the court finds that plaintiffs' view of the fair market value is wrong.

■       In resolving the issue, we must first examine what Bakersfield purchased from Morgan. Bakersfield purchased title to four parcels of real property subject to existing long-term, triple-net leases. Those triple-net leases were described by Darcy as "strong" and containing "everything." The court's interpretation of Darcy's testimony and the lease instruments is that the stores have strong safeguards of their interests in the properties, including control of the properties. The rents paid by the stores under the leases are less than fair market rents. This has the effect of shifting substantial value to the tenants' leasehold interests.

Although the four leases all contain provisions permitting the stores to buy the properties from the investor-lessors under certain conditions[9] the prices are fixed by a Schedule C attached to each user lease. Over time, Schedule C

---

[9] Albertsons may purchase the California stores if there is a condemnation, casualty or the property is uneconomic or unsuitable. Skaggs may purchase the Colorado store under a wider range of circumstances, including those mentioned above.

provides a diminishing price for each property. With the exception of the Colorado property, the diminishing prices roughly correspond to the amounts due on the underlying mortgages.

Further, all termination conditions contained in the leases tie any purchase price by the stores to Schedule C. For example, if a store wants to terminate a lease under an appropriate condition, it must make an irrevocable offer to purchase the property at the price applicable on Schedule C. While this gives the investor-lessors some protection, it also affords a significant benefit to the store. Schedule C recognizes no increase in value due either to inflation or any added improvements made by the store. On termination the investor-lessors are entitled to the benefit of any improvements made to the property by the store. However, since the value of those improvements is not reflected in the Schedule C price, the "benefit" provision is meaningless unless the leases are allowed to expire.

Plaintiffs' position assumes that (1) inflation will increase the value of the properties, and (2) the investor-lessors will realize that value upon termination of the leases. Plaintiffs rely on the increased value to justify the inflated purchase price paid by Bakersfield. However, the Schedule C prices to be paid by the stores move in exactly the opposite direction. The prices diminish during the time the property may be increasing in value. The only way the investor-lessors could benefit from inflation is if the stores declined to exercise their right to purchase the properties. If the properties increased in value, it stands to reason the stores would exercise their right to purchase at the diminished price.

In the event of condemnation, the stores must offer to purchase the property. This will benefit the store if the property increases in value because, again, the Schedule C price diminishes. If plaintiff's projections of value increases are valid, a store could purchase a property for less than the amount paid in condemnation.

In the event of a partial taking involving the California properties, the investor-lessors are entitled to receive any compensation paid in excess of the costs of repairs. However, any amount so received reduces the amount to be paid by the

store under Schedule C. Further, the user rent is also reduced by a percent of the amount received by the investor-lessors. If a partial taking involves the Colorado property, the lessee is entitled to any compensation received in excess of the costs of repairs and is responsible for any deficiency.

The court finds it significant that the investor-lessors cannot reject a store's irrevocable offer to purchase at the Schedule C price without written consent of that property's mortgagee. Neither party introduced evidence as to the position of the mortgagees or whether the mortgagees would consent to any investor-lessors' rejection of a store's offer to purchase. Viewing the relative financial positions of the parties, that is, two national chain stores as opposed to individual investors, it is not unreasonable to infer that the mortgagees would not agree to a rejection without a store's permission. If that is the case, the stores have absolute and complete control over the price of the properties to be received by the investor-lessors during the initial terms of the leases.

Defendant points out one other interesting lease provision. The lessees of the California properties can avoid being required to make an irrevocable offer to purchase by providing a substitute property to the investor-lessors. Under this provision, the substitute property must meet certain conditions. If it does, the store conveys that property to the investor-lessors and the investor-lessors convey the subject property to the store. Again, this forced exchange provision does not appear to take into account any increase in value in the subject property.

## LAND RESIDUAL VALUE

Plaintiffs claim the land residual value is significant. Plaintiffs estimate the land value in 1982 of all four properties was $4,965,000. They project an increase in value to $39,298,569 by the year 2028. Based on this, plaintiffs argue that Bakersfield was justified in paying $4,350,000 for the property in 1982.[10]

---

[10] The court is not sure of plaintiffs' point. It seems clear that if property appreciates at only 4.6 percent per year but investors require a discount rate of 11.31 percent per year until the Bakersfield note is paid off in 2012 and 8.5 percent per year thereafter, the longer the discount period, the less net present value.

Plaintiffs' arguments ignore the substantial restrictions on Bakersfield's interest in the properties. In fact, Bakersfield's interest is subject to the limitations contained in *two leases* on the same property. The user leases described above give the stores control of the properties and thereby shift most of the value of the properties to the stores' leasehold interests. In addition, however, Bakersfield's interest in the properties is subject to the terms of the wrap leases given to Morgan. Those leases contain similar "irrevocable offer" provisions that enable the lessee to buy at Schedule C prices. This second layer of leases provides an additional encumbrance on Bakersfield's interest in the residual values. The effect of these two layers of leases can be seen in the sale of store No. 649.

## SALE OF STORE 649

Morgan purchased its interest in store No. 649 for $519,401. In turn, Bakersfield paid Morgan $900,000 for its interest in the property. Plaintiffs' agents had the property appraised by Merrill Lynch, a national appraisal firm. That firm determined the land had a fair market value of $1,050,000 and, with the improvements, the property had a total fair market value of $2,250,000.

Eight years later, in 1990, Albertsons decided to purchase the property and terminate its lease. If plaintiffs are to be believed, this is the very situation Bakersfield hoped would occur. Such an early termination would allow plaintiffs to realize a large gain from the residual value. Thus, although Bakersfield paid $900,000 for this property, on termination of the lease, it should obtain property worth more than $2,250,000.

What actually happened? Albertsons paid $325,000 and effectively assumed the balance of the existing mortgage of $257,000.[11] As a result, Albertsons regained ownership of property worth at least $2,250,000 by paying a mere $582,000. One can reasonably ask: What happened to the other $1,668,000 of value? The answer is: Albertsons already owned it by virtue of owning the leasehold interest.

---

[11] Albertsons continued to pay rent to the extent that the rent was security for the underlying mortgage.

Darcy testified that RAG, which had by then purchased Morgan's position, and Bakersfield split the cash paid by Albertsons approximately fifty-fifty. Plaintiffs reported on their partnership income tax return that Bakersfield received $156,758 in "other" gain. RAG apparently received $155,000 and the difference in dollars is explained by fees or commissions.

The price was more than the Schedule C amount. In examining the No. 649 lease, a sale which took place on July 31, 1990, had a scheduled price of $259,768.59, the approximate amount of the underlying mortgage. Since Albertsons paid $325,000 plus effectively assumed the underlying mortgage of $257,000, it appears it paid approximately $322,000 more than the Schedule C price. However, the price was not dictated by Schedule C because it was not a "condemnation" or "casualty" or deemed "uneconomic or unsuitable" as defined in the lease. In other words, Albertsons did not have a right to purchase the property. More importantly Bakersfield *was not required to sell*.

There are a number of questions concerning the negotiations and the motivations of the parties which were not answered by the evidence. Despite these unanswered questions, the sale establishes one salient fact: Bakersfield did not receive property worth $2,250,000.[12] Why? Again, the answer is: it owned only a lessor's interest. Most of the value was already owned and controlled by the lessee Albertsons.

## BAKERSFIELD'S REPORTED GAIN

On its partnership return, Bakersfield reported a sale price of $1,117,131 for the sale of store No. 649. The return shows Bakersfield realized a gain composed of ordinary gain (recaptured depreciation) of $368,575 and "other" gain of $156,758 for a total of $525,333.

In examining the return, the question arises as to how Bakersfield derived a sales price of $1,117,131? Albertsons did not pay that amount, even with the assumed debt. The answer is that Bakersfield's reported basis of $960,373 is

---

[12] In theory the property may have been worth more since the land should have appreciated in value during the eight-year period since Merrill Lynch appraised the property.

*all* debt. As Darcy explained, Albertsons "assumed" RAG's (Morgan's) position and also acquired Bakersfield's debt of $960,373.[13] Thus, Bakersfield would be required to treat the $960,373 as part of the sales price. Being relieved of debt of $960,373, plus receiving cash of $156,578, results in a purchase price of $1,117,131.

The most important fact established by the sale of store No. 649 is there is no relationship between what Bakersfield may receive upon termination of a lease and the fair market value of the property.

## WRAP LEASE CONSEQUENCES

Darcy testified that Morgan, in the middle position, takes "tremendous" risk. Plaintiffs', in their brief, argue that Morgan took the risk that the stores would eventually purchase the properties or "walk away" from their leases. This could result in a big gain to Morgan. This, plaintiffs argue, justified Morgan paying more under the wrap lease than it receives from the user leases. At the same time, plaintiffs argue Bakersfield was justified in paying an inflated price to Morgan because of the potential for obtaining the residual land values early. In effect, plaintiffs are trying to use the same value twice; once as justification for the lease differential and a second time for Bakersfield to pay an inflated price.

In reality, when store No. 649 was sold, the wrap lease tenant, RAG (Morgan's successor), got 50 percent of the proceeds and Bakersfield got 50 percent of the proceeds. Darcy testified that this was a normal split in these kinds of situations. If that is true, then all of plaintiffs' claims with regard to residual values benefiting Bakersfield should be reduced by at least 50 percent.

## THE MERRILL LYNCH APPRAISALS

Plaintiffs point to the Merrill Lynch appraisals as justification for the price paid by Bakersfield. In the court's view, such appraisals are misleading. For example, the appraisals represent the value of Bakersfield's interest in store No. 649 to be $900,000. This valuation is based upon the

---

[13] The obligation to pay the Bakersfield note and the corresponding right to the wrap lease payments from Realty Asset Group were offsetting and therefore cancelled.

lease agreements between Morgan and Bakersfield. The appraisals lead the reader to believe that because the property has a fair market value of $2,250,000, the value of Bakersfield's interest is $900,000.

The overall message and the individual calculations are misleading. The calculation of Bakersfield's value is not related to the fair market value of the property. The rent due under the user leases is not fair market rent. The wrap lease payments are not tied to fair market value. While calculations appear to relate Bakersfield's interest to the fair market value of the property, there is no connection.

Defendant's witness, Dr. Whitelaw, a professor of economics, testified that the numbers involved in Bakersfield's purchase and wrap lease are not driven by the market value of the property or the user rents. A second witness, Mr. Reeder, a tax economist, testified one could set the rents at $2,000,000 a year and schedule the note payments accordingly to show an incredible value for Bakersfield's interest.

Dr. Whitelaw interpreted the Merrill Lynch appraisals as appraising the value of the payments between the parties. His analysis used the appraisals themselves as evidence there was no economic justification for the increased price from Morgan to Bakersfield. The court agrees.

## ANALYSIS OF LEASE VALUES

Both Dr. Whitelaw and Mr. Reeder testified that Morgan, as a wrap-lease tenant, was in a negative position. Morgan was obligated to pay no rent to Bakersfield under the wrap lease through January, 1983, $22,374 per month for the next two years and then $47,970 per month thereafter. This gave Bakersfield's interest in the lease a net present value of $4,697,648.[14] In turn, Morgan was entitled to receive rent from the user leases. This right had a net present value of $2,986,771. *See supra* note 4. Thus, Morgan's lease position had a negative net present value of $1,885,909.

---

[14] Although defendant appears to have made several errors in calculating the net present value of Bakersfield's interest — the correct value being $4,403,205 — the court will use defendant's figures to illustrate the point.

These two expert witnesses also testified this arrangement does not make economic sense. The court sees only two possible explanations. One, Morgan expected the user rents to go up, an implausible expectation. The rents were already less than market rents and were scheduled to decline further. The court sees absolutely no possibility that Morgan could anticipate any increase in rents. While Mr. Darcy testified that Morgan hoped to accelerate realization of the residual value "through management and through the proper handling of the asset," such testimony is not related to reality. Neither Morgan nor Bakersfield had any control or management over the properties. Under the strong triple-net leases in place, the stores had virtually all of the control.

The second and only explanation that makes sense is Morgan viewed the note payments from Bakersfield as an offset to the wrap lease payments. As Mr. Reeder testified, this implies that the title Bakersfield held had no real value. Comparing the two alternative views suggests the realities:

(a) Considering the note and lease payments separately: Morgan would pay rent of $47,970 per month and only receive rent of $22,755 per month. This results in a negative cash flow to Morgan of $25,215 per month.

(b) Considering the note and lease payments together: Both Bakersfield and Morgan have positive cash flows. Since Morgan was receiving $3,619 monthly in excess user rents, Morgan could afford to pay $47,970 in lease payments and receive from Bakersfield only $45,245 in note payments. This gave Bakersfield a positive monthly cash flow of $2,725 and Morgan a positive monthly cash flow of $894.

That Morgan viewed the note payments as an offset to the wrap-lease payments is established by the sale of Morgan's position to RAG. In 1986, RAG purchased Morgan's position and became the lessee of Bakersfield under the wrap leases. RAG acquired the right to receive the excess user rents under the user leases. It also purchased Bakersfield's note entitling it to payments thereunder.

As defendant points out, if Morgan and RAG viewed the Bakersfield note as real, one would expect RAG to pay a purchase price near the balance due on the Bakersfield note

which, at that time, was in excess of $5,000,000. Mr. Reeder was unable to obtain the information for all four properties. Nevertheless, his analysis of the Morgan sale price of three properties shows RAG paid a price equal to the mortgage balance due on each property plus $17,500. Thus, RAG did not pay anywhere near the amount due under the Bakersfield note. It is true that RAG, as a sophisticated purchaser, would discount the value of Morgan's interest due to its negative position under the wrap lease. However, it makes no difference whether Morgan and RAG viewed the Bakersfield note as having little value or whether RAG discounted the purchase price for the negative lease position. Both explanations result in the same conclusion: The price paid by Bakersfield made no economic sense.

Plaintiffs claim Morgan got a discount by buying all four stores at once. However, Bakersfield also purchased all four stores at once. Bakersfield's agent and Morgan's agent were the same. In viewing the transaction, it is not clear to the court that Morgan even put up any of its own money. It is possible that the cash from Bakersfield paid for Morgan's purchase.

The court does not find Mr. Darcy's explanations credible with regard to the price paid by Morgan and the price paid by Bakersfield. He indicated that the transactions had to be concluded in a short time. He believes Mr. Dunn got a "super bargain" for Morgan by virtue of being able to come up with quick cash. It is not believable to this court that a sophisticated market would give up a profit of $1,773,843 on a $2,500,000 deal. To the contrary, it appears someone was looking to justify an inflated price long before the deal was done. Exhibit E tries to justify an inflated price to Bakersfield but uses a property located in Salt Lake City instead of the property actually involved in Buena Park. That analysis focuses on the abandonment of the property by the users as being the source of the substantial profit to be realized by Bakersfield. It states: "This vast potential is precisely the reason for the substantial increase in the purchase price." The court finds that the probability of abandonment by the stores under the user leases in force was nonexistent.

## CONCLUSIONS

The transaction between Morgan and Bakersfield made no economic sense as to either party. A transaction

lacking substantial legal and economic significance aside from tax considerations as to both the buyer and seller is a sham. *See Hilton v. Commissioner*, 74 TC 305, 364 (1980) *aff'd* 671 F2d 316 (1982). Bakersfield's method of purchase did not create an equity which a prudent buyer would not abandon. *See Estate of Franklin v. Commissioner*, 544 F 2d 1045, 1048 (9th Cir 1976), *aff'g* 64 TC 752 (1975). Bakersfield's purchase price for the property far exceeded any reasonable estimate of its fair market value. The structure of the transaction resulted in Bakersfield's debt increasing to over $5,000,000 before any principal payments were made. As in *Hilton*, the court is persuaded that little or no weight should be placed on the possibility that plaintiffs would benefit from a potential residual value if the user leases were abandoned. Due to the terms of the user leases, Bakersfield had no reasonable expectation of acquiring an equity in the property. *See Rice's Toyota World, Inc. v. Commissioner*, 81 TC 184, 209 (1983), *aff'd* 752 F2d 89 (1985). The court concludes there was no business purpose for the transaction other than the avoidance of taxes and the transaction was lacking in economic substance.

Based on the above analysis and findings, the court finds that defendant's opinion and order for each plaintiff must be sustained. Defendant to recover its costs.