I. INTRODUCTION
This matter is before the court on Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion to Strike, and the Cross-Motion for Summary Judgment of Defendant Department of Revenue (the department). Plaintiffs are PacifiCare Health Systems, Inc. (PHS), the common parent corporation in a group of affiliated corporations that includes plaintiffs PacifiCare Life Insurance Company (PLA) and *Page 462 
PacifiCare Life and Health Insurance Company (PLHIC). Those and other corporations, wholly owned directly or indirectly by PHS, filed a consolidated federal income tax return. In many cases, such an affiliated group would also file a consolidated return for Oregon income tax purposes. ORS 317.710.[1] In such cases, the intercompany transactions that form the basis of this case would produce no net tax consequences, as income to a receiving member would be offset by a deduction to the related paying member. Most of Plaintiffs' affiliated group members are health maintenance organizations or engaged in management of such programs; however, PLA and PLHIC engage in the insurance business and, under ORS 317.710(7), must file separate Oregon returns. Only PHS and its noninsurance subsidiaries together filed an Oregon consolidated return and unless otherwise indicated, references to taxpayer in this order are references to PHS and such subsidiaries. Because PHS and PLHIC did not file a consolidated Oregon return, intercompany transactions were not offset and were separately reported.
The factors used to apportion income among Oregon and other states differ for the Oregon consolidated group and PLHIC (the Insurance Subsidiary).[2] Of income reported by the Insurance Subsidiary, less was apportioned to Oregon under the apportionment rule for insurance companies for the years in question (1999 and 2000) than would have been apportioned to Oregon if reported in taxpayer's Oregon consolidated return. The proper accounting for income from certain licenses of intangible property and related deductions is the issue in this case.[3] *Page 463 
 II. FACTS
PHS owned, directly or indirectly, all of the stock in all of the corporations comprising the affiliated group that filed a consolidated federal income tax return. That group included the Insurance Subsidiary and PLA. PHS was a holding company whose wholly owned first-tier subsidiary, PacifiCare Health Plan Administrators, Inc. (PHPA), owned all or substantially all of the stock in the second tier members of the group.[4]
As of October 1, 1998, PHS and PHPA (then known as PacifiCare Operations, Inc.) entered into a Contribution and Assignment Agreement (the Contribution Agreement) with the Insurance Subsidiary. Pursuant to the Contribution Agreement, PHS and PHPA collectively contributed to the capital of the Insurance Subsidiary names, service marks, trademarks, logos, slogans, tag lines, and other intellectual properties used by the members of the corporate family and then owned by PHS or PHPA or both (the Intellectual Properties). The contributors also agreed to make further capital contributions of any additional such property that the contributors might in the future develop, create, or purchase. Specific terms of the Contribution Agreement and other documents will be more fully described below.
At the same time, the Insurance Subsidiary entered into and began collecting royalty fee income from PHS and its subsidiaries under agreements by which the Insurance Subsidiary licensed to PHS and its subsidiaries the use of the Intellectual Properties it had acquired from PHS and PHPA. The licenses were generally uniform in their provisions, some of which will be more specifically discussed below. Prior to the contribution of the Intellectual Properties to the Insurance Subsidiary, the licensee corporations had enjoyed use of the Intellectual Properties without charge.
As licensees from the Insurance Subsidiary of the Intellectual Properties they had contributed, PHS and its *Page 464 
first-tier subsidiary, PHPA, were not required to make royalty payments in cash. They instead agreed to furnish the Insurance Subsidiary with administrative services, consultations, personnel, and other appropriate resources to assist the Insurance Subsidiary with the development, usage, management, display, and protection of the Intellectual Properties.
Other corporations in the PacifiCare family who were licensees of the Intellectual Properties agreed to pay cash royalties to the Insurance Subsidiary computed as a percentage (1.75 percent) of adjusted gross revenue of the licensee. All such payments were deducted by the payor corporations in computing their income tax liability, and the aggregate of such deductions was reflected in the Oregon consolidated income tax return for PHS and its noninsurance subsidiaries, thus creating a significant tax benefit for those companies. The revenue from those royalty payments was included in the separate income tax return of the Insurance Subsidiary.
For the 1999 and 2000 tax years, the department disallowed royalty expense deductions of PHS and its subsidiaries. This action treated the royalty transactions as if they had not occurred or, if they did occur, had been engaged in by PHS and PHPA as licensors and the payor subsidiaries as licensees. The effect of this action was to eliminate the tax benefit that PHS had hoped to enjoy by reason of separate treatment of royalty deductions in the relatively higher tax environment of the consolidated return of the payors and inclusion of the associated royalty income in the relatively lower tax environment of the statutorily required separate company return of the Insurance Subsidiary.
 III. ISSUE
As stated above, the issue in this case is the proper accounting for the set of transactions generated by taxpayer within a legal environment created by the State of Oregon. For the reason discussed below, the issue resolves to which company should, in the years in question, be treated as the owner of the Intellectual Properties. *Page 465 
 IV. ANALYSIS
Taxpayer has premised its position on the view that the only transactions that should concern the department or this court are the licensing arrangements pursuant to which the Insurance Subsidiary purported to license use by other group members of the Intellectual Properties. Taxpayer then asserts that evaluation of the licensing transactions may only occur under the arm's-length transaction standard of Internal Revenue Code (IRC), section 482, [5] made applicable in Oregon through ORS314.295. ORS 314.295 provides:
 "Apportionment or allocation of net income where two or more organizations, trades or businesses are owned or controlled by the same interests. In any case of two or more organizations, trades or businesses (whether or not incorporated, whether or not organizes in the United States and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Department of Revenue may distribute, apportion or allocate gross income, deductions, credits or allowances between or among such organizations, trades or businesses, if it determines that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades or businesses."
Finally, taxpayer argues that it has introduced competent evidence that "arm's-length" royalty rates were paid and that the department has remained mute on that point.[6] Taxpayer concludes that the case must, therefore, be resolved in its favor.
For its part, the department acknowledges that it does not choose to fight on the ground of the "arm's-length" standard as to the amount of royalties paid and received, but urges that the initial transfer of the Intellectual Properties should be scrutinized and disregarded for tax purposes. However described, the position of the department reduces, in the opinion of the court, to the argument that the parent *Page 466 
remained the owner of the Intellectual Properties for tax purposes. Taxpayer's argument is premised on the position that, for tax purposes, the Insurance Subsidiary is the owner of the Intellectual Properties. In the opinion of the court, the ownership issue is decisive because, as demonstrated by most, if not all, of the case law discussed in this opinion, one of the most fundamental principles of income taxation law is that income from property is to be reported by the owner of the property.
In this case the parties stipulated to a statement of the issue, as they saw it, for purposes of this case. The stipulated statement of the issue is:
 "Under ORS 314.295 and the facts of this case, may the Department of Revenue eliminate the deductions claimed by PacifiCare Health Systems, Inc. and subsidiaries for royalties paid to PacifiCare Life and Health Insurance Co., and eliminate the corresponding royalty income of PacifiCare Life and Health Insurance Co.?"
The elimination of deduction referenced in the stipulation can be achieved by treating the royalty income at issue as that of PHS. See footnote 3 above. Taxpayer has asserted that the department impermissibly deviated from that stipulated statement of the issue in arguing, in its Cross-Motion for Summary Judgment, that its actions in adjusting taxpayer's return are justified either under ORS 314.295 or under the sham transaction and economic substance doctrines.[7] Several observations are relevant.
1. First, whatever the parties may or may not have agreed to is not binding on the court. The jurisdiction of the court extends to determining the correct amount of deficiency, if any. Amounts and reasons can be different from those advanced by the department, so long as taxpayer is afforded an opportunity to address any change in position of the department. ORS 305.575. Here, taxpayer had, and took, such opportunity.
2. Second, the sham transaction and economic substance arguments made by the department do not fall outside *Page 467 
of the authority granted to the department under ORS 314.295. That statute is modeled on IRC section 482, a statute whose reach is either coterminous or overlapping with doctrines related to ownership of property, assignment of income, and substance over form. Boris I. Bittker Lawrence Lokken, 4 Federal Taxation of Income, Estates Gifts 79-136 (3d ed 2003); cf Stewart v. Comm'r, 714 F2d 977 (9th Cir 1983) (stating that overlap of IRC § 482 and substance over form doctrine permitted the IRS to change positions without prejudice to taxpayer). ORS 314.295 permits the department the authority to distribute, apportion, and allocate items of income and deduction between or among commonly controlled organizations. That is precisely what the department did here, and the question is whether its actions were appropriate to prevent evasion of tax or to clearly reflect the income of any of the members of taxpayer's corporate family.
The court has concluded that the proper analysis in this case is to consider which corporation was, for tax purposes, the owner of the Intellectual Properties. The court is of the opinion that if income from property is reported by a controlled group member who is not the owner of that property for tax purposes, the department has authority under ORS 314.295 to take action to cause the returns of related taxpayers to properly reflect ownership of the property for tax purposes.
3. On the question of ownership of property for tax purposes, federal tax law and interpretations govern, except in instances where, and not present here, the Oregon legislature has provided otherwise. Baisch v. Dept. of Rev., 316 Or 203, 209-10,850 P2d 1109 (1993) (en banc). Among the federal principles or doctrines that are relevant is the doctrine of substance over form: the doctrine that tax liability be based on "objective economic realities of a transaction rather than * * * the particular form [that] the parties employed." Baisch,316 Or at 210 (quoting Frank Lyon Co. v. United States,435 US 561, 573, 98 S Ct 1291, 55 L Ed 2d 550 (1978)).
In Baisch, our Supreme Court was presented with a sale-leaseback transaction and analyzed it using a two-prong *Page 468 
test developed by federal courts to determine if a sale-leaseback transaction was a sham for tax purposes.Id. at 211. That two-prong test examined: (1) whether the transaction had a business purpose other than tax avoidance, and (2) whether the transaction had objective economic substance beyond the creation of tax benefits. Id. InBaisch, our Supreme Court was careful to point out the two-prong test was consistent with but not required by theFrank Lyon case. Id. Our Supreme Court carefully reserved any decision on whether a sham can exist, for tax purposes, only when both business purpose prong and economic substance are lacking. Id. n 7. Nor did our Supreme Court indicate that other judicial doctrines or analyses developed in the federal courts would be unavailable in determining whether the economic substance of a transaction might be the basis for taxation as opposed to the form in which the transaction was cast by the parties.[8] See id.
at 218-19.
4. Although taxpayer has focused on the propriety of the royalty rate paid by related entities after the purported transfer of the Intellectual Properties to the Insurance Subsidiary, the court is of the opinion that the first question to be answered is whether, for tax purposes, any transfer of the Intellectual Properties occurred. There is no doubt that when the appropriate tax treatment of intercompany royalty transactions in respect of intellectual property is at issue, the question of ownership of the intellectual property must first be settled. In both Eli Lilly Co. v.Commissioner, 856 F2d 855 (7th Cir 1988), and GD Searle Co. v. Commissioner, 88 TC 252 (1987), decisions addressed by the parties in this case in supplemental briefing, questions arose about what the proper tax treatment should be of certain transactions that *Page 469 
occurred following the contribution by the taxpayer of certain intellectual property to a subsidiary corporation.[9] EliLilly, 856 F2d at 857; GD Searle,88 TC at 340-41. The subsidiary was organized under the laws of Puerto Rico and, like the Insurance Subsidiary here, could not be included in a consolidated tax return of the parent company.See Eli Lilly, 856 F2d at 857; GD Searle,88 TC at 342. Following the contribution, the property was either used by the subsidiary or licensed in exchange for royalty payments. Eli Lilly, 856 F2d at 857; GDSearle, 88 TC at 341.
In both cases, the United States Tax Court and, in the case ofEli Lilly, the Seventh Circuit, were asked to review the tax consequences of post contribution activity. In each case, however, the courts first addressed whether in substance, as well as form, there had in fact been a transfer of the intellectual property. See Eli Lilly, 856 F2d at 860;GD Searle, 88 TC at 340. In GD Searle, the United States Tax Court concluded that the contribution constituted a transfer of ownership in substance as well as a form. See id. at 354-56. Only then did the Tax Court undertake an analysis of the later transactions under IRC section 482. Id. at 356-76.
The United States Tax Court and the Seventh Circuit in EliLilly followed the same methodology. The appellate court specifically stated that the ownership determination "must precede determination of [later] arm's length transfer prices * * *." Eli Lilly, 856 F2d at 864. The appellate court considered Internal Revenue Service statements directed specifically at whether and when, in the case of intangible assets and Puerto Rican subsidiaries, a transfer of ownership had occurred.[10] Id. *Page 470 
The more general inquiry, outside of the case of Puerto Rican subsidiaries, as to ownership of property is a not uncommon inquiry in the law of taxation, even though the analysis employed by the courts has not always been clearly defined.See Bittker Lokken, 4 Federal Taxation ofIncome, Estates and Gifts at 75-36 to 75-37. The advent of consolidated return reporting has rendered ownership inquiries within families of affiliated corporations largely moot at the federal level, when, as here, all parties are members of the consolidated return group. Ownership inquiries remain important, however, for state taxation and in certain other areas, including taxation of international transactions where some commonly controlled companies are in a consolidated return and some are not. Case law guidance does exist from such other areas of the law of federal taxation.
A leading case on the question of when ownership for tax purposes changes is Commissioner v. Sunnen, 333 US 591,68 S Ct 715, 92 L Ed 898 (1948). Sunnen was a case involving a purported transfer of certain income producing contract rights from Sunnen to his wife. Id. at 593-95. The contract rights arose under license agreements between Sunnen, who was an inventor-patentee, and a corporation in which he held a controlling interest. Id. at 593. The terms of the agreements between Sunnen and his controlled corporation were as follows:
 (1) The agreements were nonexclusive.
 (2) Sunnen retained ownership of relevant patents.
 (3) The corporation agreed to pay ten percent of gross sales price as a royalty.
 (4) No minimum production or sales terms bound the corporation.
 (5) Either Sunnen or the corporation could cancel the agreements upon notice of six months, as to some, or one year, as to others.
 (6) The contracts had ten-year terms, absent cancellation. *Page 471 
Id. at 593-94. Sunnen transferred all of his interest in the contracts to his wife, by gift. Id. at 595. The question was whether income from the contracts was property taxable to Sunnen or his wife. Id. at 603-04.
The court in Sunnen stated that the principles of the cases of Helvering v. Clifford, 309 US 331, 60 S Ct 554,84 L Ed 788 (1940), and Helvering v. Horst, 311 US 112,61 S Ct 144, 85 L Ed 75 (1940), were "guideposts for those who seek to determine in a particular instance whether such an assignor retains sufficient control over the assigned contracts or over the receipt of income by the assignee to make it fair to impose income tax liability on him." Id. at 606.[11] The particular features of the arrangements that the court found significant were that:
 (1) Sunnen, albeit indirectly, retained the power to cancel the contracts and therefore retained a substantial interest in the contracts assigned.
 (2) Sunnen could, by controlling the corporation that was a contract party, control the amount of production and sales income and thus the amount received by his wife.
Id. at 608-09.
The court in Sunnen relied heavily onClifford, a case in which the question was whether a trustor could be treated as the owner of property purportedly transferred into a trust for which the trustor was trustee.Id. at 605-08 (citing Clifford,309 US at 335). The court in Clifford was concerned with "the terms of the trust and all circumstances attendant on its creation and operation." 309 US at 335. Looking beyond "[t]echnical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct," the court concluded that given several factors, including retained control by the trustor, he continued, for tax purposes, to be the owner of the income-producing property in question. Id. at 334-35. *Page 472 
5. On the issue of control, the court in Clifford
concluded that no substantial change was effected by the transfer into trust. Id. at 335-36. The court also asked whether there was any substantial change in the economic position of the trustor. Id. Employing this approach, the question becomes whether there was, as a result of the purported transfer of the Intellectual Properties to the Insurance Subsidiary, any substantial change in the economic position of taxpayer that has occurred. See also Higgins v.Smith, 308 US 473, 60 S Ct 355, 84 L Ed 406 (1940).
6. In the realm of purported transfers between commonly controlled corporations, retention of control over an asset purportedly "transferred" to another corporation has determined which corporation is considered the owner of an asset for tax purposes and therefore responsible for reporting income from the asset. In National Lead Co. v. Commissioner,336 F2d 134 (2d Cir 1964), cert den, 380 US 908 (1965), a domestic parent corporation purported to sell stock in one British corporation to the parent corporation's wholly owned British subsidiary. There, as in the case before this court, the mechanisms of a consolidated return were not available or relevant. Id. at 140. In National Lead, the parent purported to sell shares to its controlled subsidiary, a company that — like the Insurance Subsidiary here — had a legitimate separate existence and had not been created for the purpose of completing the transaction. Id. at 139.
However, as is true in the case before the court, clear tax motives existed for the purported sale.[12] Id.
at 139-40. The transfers, in National Lead and here, were proposed by the parent company that, at all times, exercised substantial domination and control over the subsidiary with respect to the property in question and the relationship of the companies to that property. Id. at 140. The court inNational Lead *Page 473 
concluded that the taxpayer parent corporation retained such control of the purportedly transferred property that, in the years after that of the purported transfer, dividends from the property and gain from later disposition of the property were properly chargeable to the parent and not the subsidiary.Id. at 140-41. Even though the nominal transferee had independent status for tax purposes and even though the purported transfer had occurred in a prior year, the income and gain from the year in question was subject to reallocation to the true "tax owner" of the property. Id.
 National Lead is one of a myriad cases, likeSunnen, that stand for the proposition that control of assets is a primary determinant of tax ownership. InNational Lead the control existed because the domestic parent could, as sole shareholder, govern all affairs of the British subsidiary. Id. at 140. There is universal recognition that the key question is control, however exercised.Griffiths v. Helvering, 308 US 355, 357, 60 S Ct 277,84 L Ed 319 (1939). Ingenuity in the design of control has not deterred the courts. Nor are basic features permitting control to be ignored.
Accordingly, seasoned precedents such as Corliss v.Bowers, 281 US 376, 50 S Ct 336, 74 L Ed 916 (1930) remain relevant. In Corliss, the taxpayer transferred income producing property to a trust, of which family members were the income beneficiaries and remaindermen. Id. at 377. Under the trust instrument, taxpayer reserved the right to modify the trust or to revoke it. Id. Justice Holmes, although referring to certain statutory provisions, spoke for the court in broader terms, concluding that "income that is subject to a man's unfettered command and that he is free to enjoy at his own opinion may be taxed to him as his income * * *."Id. at 378. That conclusion was based on the observation that "`taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed — the actual benefit for which the tax is paid.'" Boulware v. United States, ___ US ___,128 S Ct 1168, 1176, 170 L Ed 2d 34 (2008) (quoting Corliss,281 US at 378, as applicable far beyond the particular circumstance of Corliss itself). "And it makes no difference that such `command' may be exercised through specific retention of legal title, the creation of a new *Page 474 
equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." Griffiths, 308 US at 357-58.
With the foregoing principles in mind, the court now turns to the facts of this case. A careful review of the legal and practical relationships among members of taxpayer's corporate family leads the court to the conclusion that the purported transfer of the Intellectual Properties to the Insurance Subsidiary should not be respected for income tax purposes. First, and most important, if not decisive, the purported transfer was one that could effectively be rescinded at any time at the option of taxpayer. In the Contribution Agreement, taxpayer has the right to direct the Insurance Subsidiary to distribute back to it, without charge, some or all of the Intellectual Property. That right exists in the case of the occurrence of certain events or conditions, some of which, such as involuntary bankruptcy, are clearly not within the control of taxpayer. However, the election to effectively revoke the initial and subsequent transfers also exists where:
 (1) The Insurance Subsidiary no longer is controlled by taxpayer;
 (2) Taxpayer instructs the Insurance Subsidiary to discontinue the license of the Intellectual Property; or
 (3) The capital and/or surplus of the Insurance Subsidiary falls below 250 percent of the authorized control level of risk-based capital required under the insurance laws to which that company is subject.
To one extent or another, the occurrence or nonoccurrence of each of these conditions is within the control of taxpayer. For example, a sale of the Insurance Subsidiary to a third party would be an event solely within the control of taxpayer and, if undertaken, would permit taxpayer to recover the Intellectual Properties. Further, by a mere instruction from taxpayer to the Insurance Subsidiary to discontinue the license of the property, taxpayer can trigger its right to reacquire, without cost, the Intellectual Properties.
In the event of such a reacquisition of the Intellectual Properties, taxpayer could also terminate any license agreements entered into by the Insurance Subsidiary. This is the *Page 475 
result of provisions in each license agreement that cause those licenses to terminate in the event the Insurance Subsidiary ceases to own all of the Intellectual Properties. Another provision permits taxpayer to continue the licenses in place if it opts to do so.
Notably, the Insurance Subsidiary bound itself, in the license agreements, to make no assignment of the license agreements other than to a commonly controlled or controlling entity without the consent of the licensee corporation. Under the license agreements, such consent can be refused in the licensee's sole and subjective discretion. As each licensee corporation is controlled by taxpayer, taxpayer indirectly controls the ability of the Insurance Subsidiary to assign its rights in the licensing contracts to any third party outside of the group of corporations controlled by taxpayer.
Additionally, section 7(a) of the Contribution Agreement, although recognizing a right of the Insurance Subsidiary to assign or take any other action it deems advisable with respect to the Intellectual Properties, warns that any such assignment or other action is subject to the provisions of Section 6. Those provisions include the right of taxpayer to demand reconveyance of the Intellectual Properties. Given this contractual term, it is doubtful that any reasonably sophisticated party unrelated to taxpayer would bargain for or take, at least for any consideration, an assignment of any of the Intellectual Properties as such party would take subject to taxpayer's self-controlled right to reacquire the Intellectual Properties. Further, even transfers to "strangers" without consideration can be blocked by taxpayer exercising its rights to require reconveyance.
Those provisions in the various agreements among corporations commonly controlled by taxpayer, when analyzed together, create a purported transfer by taxpayer that it can reverse at will by instructing the Insurance Subsidiary to discontinue the license of the Intellectual Properties. If that right is exercised, taxpayer can then choose to live with licenses negotiated by the Insurance Subsidiary, or not. And, until any reconveyance is demanded, taxpayer has contractually prevented the Insurance Subsidiary from assigning its rights as licensor and also from assigning the Intellectual *Page 476 
Properties to anyone except subject to the burden of taxpayer's "recovery" rights under section 6 of the Contribution Agreement. The court finds that taxpayer has retained such command and control of the Intellectual Properties that it should be treated as the owner of such property for tax purposes.
Under the governing case law, courts have found no tax transfer to have occurred where either control of property or the economic benefits of the property have been retained.Higgins, 308 US at 476-80. The test is disjunctive, but the court considers it appropriate to review the retention by this taxpayer of economic benefits of the Intellectual Properties as well as its retention of control. The question is whether the purported transferor can control the economic benefits of any "transfer" to the transferee or, stated differently, whether the purported transfer results in any substantial change in the economic position of the purported transferor. In Sunnen the court found that the purported transferor could, albeit indirectly, control the economic benefit to the purported transferee. 333 US at 608-610. In Clifford, retention of control and the ability of the purported transferor to revest the property in himself supported a conclusion that the taxpayer there had not changed his economic position as to the property. 309 US at 335-36.
In this case there are indications beyond the control features that indicate no substantial economic change occurred as a result of this purported transfer. At the time of the purported transfer, taxpayer and the Insurance Subsidiary entered into a Revolving Credit Agreement (the Credit Agreement) with PHPA. Pursuant to the Credit Agreement, taxpayer could require the Insurance Subsidiary to lend it up to $100 million from license revenues as long as the loan did not cause the available capital and surplus of the Insurance Subsidiary to drop below a certain level as determined by insurance regulators.[13]
The Credit Agreement is for an initial term of five years and perpetually renewable thereafter unless *Page 477 
terminated by either party. More importantly, under the Credit Agreement, no repayment obligation accrues for taxpayer until the Credit Agreement is terminated, at which time repayment is to be over five years. Again, because taxpayer legally controlled the Insurance Subsidiary, the Credit Agreement became, in effect, perpetual. Cash flow received by the Insurance Subsidiary by reason of licensing of the Intellectual Properties could, to a very significant extent, be enjoyed by taxpayer at its option.
Taxpayer and the Insurance Subsidiary recognized that the credit arrangements were de facto repatriations to the parent company of cash from licenses of the Intellectual Properties. They provided that loans would only come from licensing revenue of the Insurance Subsidiary and not from insurance premium revenue of the Insurance Subsidiary. Further, loan funding was to comply with the rules of two major insurance regulatory bodies limiting dividend payments. Nor does the existence of the Credit Agreement take away from the fact that taxpayer could, and expected to, have access to cash collected by the Insurance Subsidiary on intangible property licenses by simply causing the Insurance Subsidiary to declare a dividend. The record included business analysis that show such dividends were contemplated and planned for except to the extent that some cash might need to be left in the Insurance Subsidiary to meet insurance regulatory capital requirements.
The corporate participants understood that, whether loans or dividends were used, cash repatriation would be limited by regulatory rules but not by independent actions of independent economic actors. In fact, in the years at issue, $99.3 million was loaned from the Insurance Subsidiary to taxpayer. In addition, $139.5 million was paid by the Insurance Subsidiary as dividends to taxpayer. Total upstream payments or loans are approximately $249 million over the two years, during which royalty receipts appear to have been $375 million. Indeed, the precise timing of royalty and dividend payments was carefully considered so that insurance regulatory restraints on return of cash to taxpayer could be minimized. *Page 478 
The court concludes that in addition to command and control over the assets purportedly transferred, taxpayer also maintained a substantial part, if not all, of the potential economic benefit inherent in the property. Taxpayer would, through loans or dividend distributions, retain all royalty payments except those needed by the Insurance Subsidiary. But that had always been true of the operating cash of its affiliates to which taxpayer had access. Taxpayer could keep that cash except if it chose to contribute some to the Insurance Subsidiary. That reality did not change. Taxpayer, through its revocation rights could always return to the status quoante. Accordingly, on this basis as well, taxpayer should be treated as the owner of the property for tax purposes.
7. Taxpayer has argued that, in all events, its purported transfer of the Intellectual Properties to the Insurance Subsidiary was motivated by a valid business purpose and so must be respected. The tax ownership inquiry has not always concerned itself with the issue of business purpose. That is logical because the inquiry is about objective legal and economic facts and not about motivation. Nonetheless, a review of taxpayer's purported business purpose will be made here. The major premise of the business purpose argument is the fact that, as a regulated entity, the Insurance Subsidiary had to meet certain net capital requirements in several jurisdictions. Taxpayer then asserts a minor premise that the licensing arrangements undertaken by the Insurance Subsidiary had the possibility and effect of producing capital to satisfy the regulatory requirements. Taxpayer concludes that the purported transfer was therefore to fulfill a business purpose.
That argument suffers from a number of factual and legal weaknesses. First, all parties agree that the Intellectual Properties themselves were not, under relevant insurance regulatory regimes, credited to the Insurance Subsidiary in the calculation of necessary capital. The purported transfer itself did not satisfy the asserted business purpose. Nor would the licensing transactions appear to be consistent with the asserted business purpose. That is because the obligation of each of the licensees of the Insurance Subsidiary to make *Page 479 
royalty payments is completely subordinated to all other obligations of the payor, regardless of type or priority. That term is inconsistent with the asserted goal of producing capital for the Insurance Subsidiary. That provision makes the cash flow of the licensee no more available to the Insurance Subsidiary than would be the case if the licensee entity made dividend payments of its operating cash (without deduction for any royalty) to taxpayer as common parent and taxpayer then contributed some of the dividend cash to the capital of the Insurance Subsidiary. In both cases, operating cash from the purported licensee is only available after all other obligations are paid or provided for.
Additionally, and perhaps most telling, the provisions of the Contribution Agreement, as discussed above, provide for a right of taxpayer to require reconveyance of the purportedly transferred property in certain events. One of these is when the Insurance Subsidiary's capital and/or surplus fallsbelow 250 percent of the authorized control level of risk-based capital required under the insurance laws to which the Insurance Subsidiary is subject. A provision permitting taxpayer to have a call on the Intellectual Properties in the event the Insurance Subsidiary is financially challenged cannot be squared with the assertion that a transfer occurred so that the capital and financial position of the "transferee" was augmented for regulatory purposes. The existence of capital requirements for the Insurance Subsidiary was a coincidence and not a cause of the transactions designed by taxpayer.
 V. CONCLUSION
To summarize, before an analysis of the economic terms of the license arrangements between the Insurance Subsidiary and its affiliated companies is relevant, it must be determined whether taxpayer or the Insurance Subsidiary is the owner of the Intellectual Properties. As in National Lead, that inquiry does not call into question the status of the Insurance Subsidiary as a bona fide entity for tax purposes. Nor is the inquiry limited to the year of the initiation of the events in question. In the inquiry as to the tax owner of the Intellectual Properties, a purported transaction that leaves the "transferor" in command and control of the property, and *Page 480 
in no substantially modified economic position, is to be ignored. Because taxpayer retained both substantial control of the Intellectual Properties and the economic benefits attendant to such control, taxpayer must be treated as the owner of the Intellectual Properties and treated as such for tax purposes. The transactions in question here were motivated by tax saving goals and not by the purpose alleged by taxpayer. The department's actions are upheld.[14] Now, therefore,
IT IS ORDERED that Plaintiffs' Motion for Summary Judgment is denied;
IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is granted; and
IT IS FURTHER ORDERED that Plaintiffs Motion to Strike is denied.
[1] All references to the Oregon Revised Statutes (ORS) are to the 1999 edition.
[2] Apportionment is a necessary step for all companies involved here. That is also true for PLA, but the major focus in this case is on PLHIC, which will be referred to as the "Insurance Subsidiary."
[3] From the point of view of taxpayer, the transactions should be respected and accounted for as they occurred for nontax purposes. That is, royalty payments deducted by PHS and its noninsurance subsidiaries in their Oregon consolidated tax return and royalty income should be reported by PLHIC in its separate Oregon tax return. The department takes the position that the proper accounting is to treat PHS as the recipient of the royalty income. That has the effect of offsetting and cancelling out any benefit on the Oregon consolidated return for the deductions taken by the PHS group members who made royalty payments.
[4] PHPA owned 99 percent of the Insurance Subsidiary and PHS owned the remaining one percent. In California a third-tier subsidiary existed. Those control details are not relevant to this case, although the complete control of PHS of all subsidiaries is.
[5] Unless otherwise noted, all references to the IRC are to 1999.
[6] That evidence is a report of a major accounting firm concluding that the royalty rate of 1.75 percent of adjusted gross revenue paid to the Insurance Subsidiary by the licensee corporations is an arm's-length rate.
[7] The department added a third ground in its motion but that ground was withdrawn at oral argument.
[8] Of course the question of substance and form becomes of greatest concern where, as here, both parties to a transaction are under common control such that the discipline of adverse economic positions does not constrain those parties. AlthoughFrank Lyon may be a guide when, as was true in that case, at least one unrelated party is present in a transaction, its value is lessened when, as here, no economically unrelated party is present in the transaction. See435 US at 575-76. However, in such situations, the Frank Lyon
decision is consistent with and relied upon the decisions inCommissioner v. Sunnen, 333 US 591, 68 S Ct 715,92 L Ed 898 (1948); Helvering v. Clifford, 309 US 331,60 S Ct 554, 84 L Ed 788 (1940); and Corliss v. Bowers,281 US 376, 50 S Ct 336, 74 L Ed 916 (1930), each discussed below.
[9] The attention of the parties in their supplemental briefing was on the tax treatment of a transfer of property made by a parent company to a wholly owned subsidiary, and whether IRC section 351 would apply if no shares of the transferee corporation were issued in the transaction. That question of course assumes that a transfer has in fact occurred for tax purposes. That ownership issue is intertwined with doctrine such as sham transaction and requirements of clear reflection of income for the most basic of reasons, for a nonowner to report income from property is a sham and does not result in clear reflection of income of that party nor of the true owner of the property for tax purposes.
[10] Those authorities included Revenue Procedure 63-10, 1963-1 CB 490 and Manual Supplement 42G-86, both of which taught that purported transfers should be examined to see if various facts indicated no transfer had been made for tax purposes.
[11] It does not matter that in this case the purported assignment was of intangible property licensed after the purported assignment. All participants in the present case contemplated the licensing, all parties to the license transaction were under common control, and the licensing in fact occurred. Id. at 593.
[12] The record in this case leaves no doubt that state tax savings potentially attributable to the different regimes for taxation of insurance and noninsurance income were a major, if not the major, reason for the purported transfer and licensing of the Intellectual Properties. Taxpayer retained a major tax consulting firm to analyze the purported transaction and to express an opinion on the availability of tax benefits. Like taxpayer in this litigation, however, that firm assumed that the contribution of the Intellectual Properties would be treated as a transfer for tax purposes.
[13] Although any loan would technically be made to PHPA, that corporation was the first tier controlled subsidiary of taxpayer.
[14] The court has not placed reliance on Oregon Administrative Rule (OAR) 150-314.295. *Page 481