Jan T. and Marsha M. BAISCH,
Remy W. and Barbara F. Fulsher,
Richard F. and Mary J. Goos,
Wallace V. and Joan McKay,
and Alonzo P. and Marybeth P. Stiner,

*Plaintiffs,*

*and*

Robert and Mary BORGHORST,
Michael T.H. and Ruth M. Brodeur,
Ronald W. and Jean A. Harriman, Janice O. Hayslip,
Scott S. and Mary L. Hinsdale,
Jonathan H. and Karen C. Hoppert, Wayne C. Kaesche,
Thomas A. and Ginger L. Lorence,
Douglas E. and Lois R. McQuown,
Vincent R. and Dorothy A. Molin,
Mrs. Hester H. Nau, Bianca Pastega,
Mario D. and Alma M. Pastega,
Richard A. and Yvonne Potter,
Craig J. and Diana L. Rohlfing,
Leslie F. and Maryellen R. Stevens,
Douglas M. and Betty J. Thompson,
and Peter Barnhisel,
for the Estate of Charlie Woodstock,
*Appellants,*

*v.*

DEPARTMENT OF REVENUE,
STATE OF OREGON,
*Respondent.*

(OTC 3029)

Frank T. DUNN, Jr.,
and Barbara Dunn,
*Appellants,*

*v.*

DEPARTMENT OF REVENUE,
STATE OF OREGON,
*Respondent.*

(OTC 3131)
(SC S39327)
850 P2d 1109

Kevin O'Connell, of O'Connell, Goyak & DiLorenzo, Portland, argued the cause for appellants. Thomas J. Frazer filed the brief.

Rochelle Nedeau, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, and Bonni C. Canary, Assistant Attorney General, Salem.

GRABER, J.

## GRABER, J.

Taxpayers, who are limited partners in Bakersfield Associates (Bakersfield), an Oregon limited partnership, appeal from a judgment of the Oregon Tax Court.[1] The Tax Court held that a 1982 Bakersfield sale and leaseback of commercial property was a "sham" and, consequently, disallowed all deductions on taxpayers' personal income tax returns for 1982 through 1984 that were attributable to taxpayers' investments in that transaction. On *de novo* review, ORS 305.445, we affirm.

## FACTUAL BACKGROUND

The complex transaction that is at the core of this dispute began with four individual sales to four separate investors. In each transaction, the investor financed the purchase of a large store with bank loans secured by mortgages and, simultaneously, leased the properties back to the original owners ("users") under 25-year leases ("user leases") that, on expiration, may be renewed in five-year increments.[2] The terms of the user leases are extremely favorable to the users. The users assume responsibility for all costs associated with ownership of the stores, but also retain control over the properties. The users are guaranteed the right to purchase the properties under certain conditions, at prices that correspond roughly to the amount then due on the underlying mortgages, rather than to the prevailing market values. Rents are structured to yield the investment returns required by the investors and are, in fact, far below the fair market rate. Rents are scheduled to drop to an even lower rate when the investors' underlying mortgages are fully paid. While the mortgage is still being paid, rent payments are made to the investors' mortgagees through an escrow account, and the investors receive only the excess over their mortgage payments.

In 1982, Morgan Financial Group (Morgan), a limited partnership, bought the four stores after they had been

---

[1] Not all parties in the Tax Court proceeding are parties to this appeal.

[2] The user leases on the three properties located in California can be extended for up to 30 additional years. The user lease on the property located in Colorado can be extended for up to 35 additional years.

"packaged" by a third party, Rai-Two Management Company. Morgan paid a total of $2,576,157 for the four stores, subject to the above-described leases, and took assignment of the excess user rents, totalling $3,619 per month.[3] Morgan financed this transaction with a $215,170 cash payment, $264,000 in recourse notes, and $2,096,987 in nonrecourse notes. Morgan's general partner is F.D. & D. Realty Corporation, an Oregon corporation whose sole shareholders are Arthur M. Fuhrer, Frank T. Dunn, and Robert E. Doerr.

On the same day that it purchased the properties, Morgan sold them to Bakersfield, a limited partnership of which Fuhrer, Dunn & Doerr, a partnership of Arthur M. Fuhrer, Frank T. Dunn, and Robert E. Doerr, is the general partner. The terms of the sale were these: Bakersfield paid a total of $4,350,000[4] for the four properties, in the form of a $198,000 cash down payment, assumption of Morgan's $264,000 recourse note, and a $3,887,750 nonrecourse note to Morgan. The interest rate on the nonrecourse note was 18 percent for the first three years, falling thereafter to 10 percent. Bakersfield's initial monthly payments to Morgan on the nonrecourse note were set at $20,000, but were to rise to $45,245 after two years. Bakersfield took the properties subject to the user leases and options and received, by assignment, the $3,619 in monthly excess user rents.

At the time of the purchase, Morgan and Bakersfield also entered into a "wrap-lease." That is, Bakersfield leased the stores back to Morgan, including the right to receive the $3,619 in monthly excess user rents. Morgan's wrap-lease payments to Bakersfield were initially $22,374 per month, but were scheduled to rise to $47,970 per month after two years. Thus, the monthly note payments purportedly flowing from Bakersfield to Morgan essentially canceled out the monthly wrap-lease payments scheduled to flow in the opposite direction, from Morgan to Bakersfield.[5] In fact, there is little evidence in the Bakersfield or Morgan financial records

---

[3] The total monthly rent for the four stores was $22,755, with $19,136 per month going directly to the mortgagees.

[4] The price paid by Bakersfield was a 69 percent increase over the price paid by Morgan on the same day.

[5] The $3,619 in excess user rents received each month by Morgan made up the difference between the amounts of the payments.

of cash payments going back and forth between the two entities after Bakersfield made its initial down payment.

Taxpayers in this case are Bakersfield's limited partners, and it is their shared investment in the four properties, and the resulting tax deductions, that are at issue here. Taxpayers were approached by a Fuhrer, Dunn & Doerr representative, who sought limited partners to invest in the scheme. Each taxpayer was told that he or she could acquire an interest in the Bakersfield properties by contributing $28,000, payable over a three-year period, toward the Bakersfield purchase.

An investment memorandum summarizing the offering projected the tax and nontax benefits of the investment for each of the next 30 years. According to those projections, investors would derive enormous tax benefits in the early years after the transaction. In later years, investors would receive modest profits, along with negative tax benefits. If the investment were held for 30 years, each investor would be expected to receive $29,270 in cash distributions, a total positive taxable income of $46,837, a negative tax benefit of $25,761, and a projected $253,120 in net after-tax benefits if reinvested at nine percent. In response to that offering, each taxpayer invested in Bakersfield's purchase and leaseback and later claimed a proportionate share of the income losses, depreciation, and interest deductions generated by the transaction.

In the early years after the transaction, those deductions were significant, as Bakersfield had projected in its investment memorandum. The interest rate structure on Bakersfield's nonrecourse note to Morgan resulted in a situation in which, for several years, almost the entire amount of each payment on that note would pay interest, rather than principal. In fact, the interest structure was such that, in the first few years after the purchase, the balance due on the note increased, rather than decreased — an arrangement referred to as "negative amortization." Bakersfield also could claim depreciation of over $200,000 annually for 15 years. In addition to producing the interest and depreciation deductions, the transaction would generate taxable losses each year until the year 1998.[6]

---

[6] The transaction would not generate any cash income, aside from the tax benefits, until the year 2014.

The Department of Revenue (Department) disallowed taxpayers' deductions on the ground that the Bakersfield transaction was a sham that must be disregarded for tax purposes. Taxpayers appealed to the Tax Court, which sustained the Department's decision:

"The transaction between Morgan and Bakersfield made no economic sense as to either party. A transaction lacking substantial legal and economic significance aside from tax considerations as to both the buyer and seller is a sham. Bakersfield's method of purchase did not create an equity which a prudent buyer would not abandon. Bakersfield's purchase price for the property far exceeded any reasonable estimate of its fair market value. The structure of the transaction resulted in Bakersfield's debt increasing to over $5,000,000 before any principal payments were made. * * * [T]he court is persuaded that little or no weight should be placed on the possibility that plaintiffs would benefit from a potential residual value if the user leases were abandoned. Due to the terms of the user leases, Bakersfield had no reasonable expectation of acquiring an equity in the property. The court concludes there was no business purpose for the transaction other than the avoidance of taxes and the transaction was lacking in economic substance." *Baisch v. Dept. of Rev.*, 12 OTR 177, 193 (1992) (citations omitted).

Taxpayers appealed, objecting to the Tax Court's conclusions that the Bakersfield purchase had no business purpose or economic substance other than avoidance of taxes and that the purchase price exceeded any reasonable estimate of the investment's fair market value. They also contend that, at least, the Tax Court should have allowed them to claim deductions to the extent that the nonrecourse debt that financed the transaction does not exceed the fair market value of the properties.

## LEGAL STANDARDS

Although this controversy concerns taxpayers' Oregon personal income taxes, we apply federal tax laws and the interpretations of those laws rendered by federal courts. That is so because, with some exceptions not relevant here, calculation of the amount of state taxable income is determined by provisions of the federal Internal Revenue Code. ORS 316.007 provides:

"It is the intent of the Legislative Assembly * * * to make the Oregon personal income tax law identical in effect to the provisions of the federal Internal Revenue Code relating to the measurement of taxable income of individuals * * *; to achieve this result by application of the various provisions of the federal Internal Revenue Code relating to the definition of income, exceptions and exclusions therefrom, *deductions (business and personal)*, * * * and other pertinent provisions relating to gross income as defined therein, modified as provided in this chapter, resulting in a final amount called 'taxable income' * * *." (Emphasis added.)

Furthermore, ORS 316.032(2) provides in part:

"Insofar as is practicable in the administration of this chapter, the department shall apply and follow the administrative and judicial interpretations of the federal income tax law."

*See also Realty Group v. Dept. of Rev.*, 299 Or 377, 381, 702 P2d 1075 (1985) (Oregon personal income tax law is to follow federal provisions relating to calculation of taxable income, but not provision relating to facilitation of tax collection); *Deblock v. Department of Revenue*, 286 Or 735, 737-38, 596 P2d 560 (1979) (under ORS 316.007, the Department is to apply federal law regarding deductibility of travel expenses).

In *Frank Lyon Co. v. United States*, 435 US 561, 98 S Ct 1291, 55 L Ed 2d 550 (1978), the Supreme Court of the United States reiterated the widely accepted federal rule that taxes are to be based on the "objective economic realities of a transaction rather than * * * the particular form [that] the parties employed." 435 US at 573. Although in that case the Supreme Court accepted a sale and leaseback of real estate as objectively reflecting what it formally purported to be, the Court stated the rule for determining whether a sale and leaseback transaction may be taken at face value for tax purposes:

"We hold that where * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocations of rights and duties effectuated by the parties." *Id.* at 583.

■        Lower federal courts have drawn from that statement a two-part test: A sale and leaseback transaction is a sham if there is (1) no business purpose other than tax avoidance and (2) no objective economic substance beyond the creation of tax benefits. *See, e.g., Rice's Toyota World, Inc. v. C.I.R.*, 752 F2d 89, 91 (4th Cir 1985) (stating test); *Bail Bonds by Marvin Nelson, Inc. v. C.I.R.*, 820 F2d 1543, 1549 (9th Cir 1987) (same).

Several federal circuits have observed that, although that two-part analysis is consistent with *Frank Lyon*, it is not required by *Frank Lyon*. Business purpose and economic substance may be viewed as "simply more precise factors to consider in the application of [a] traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." *Sochin v. C.I.R.*, 843 F2d 351, 354 (9th Cir), *cert den* 488 US 824 (1988). *Accord Shriver v. C.I.R.*, 899 F2d 724, 727 (8th Cir 1990); *Rose v. C.I.R.*, 868 F2d 851, 854 (6th Cir 1989).

We agree with those courts that hold that the two-part test is consistent with, but not required by, the Supreme Court's *Frank Lyon* holding. We nevertheless choose to employ the two-part test in our analysis of the sale and leaseback transaction now before us, because it captures the essence of the Supreme Court's *Frank Lyon* holding, which has been widely used by the federal courts, and provides a manageable framework for examining complex transactions.[7]

■        Taxpayers bear the burden of proof in this case. A taxpayer seeking relief from a decision of the Department denying a deduction bears the burden of showing by a preponderance of the evidence that the deduction is allowable. *Reed v. Dept. of Rev.*, 310 Or 260, 264, 798 P2d 235 (1990); ORS 305.427.

## BUSINESS PURPOSE

■        The "business purpose" inquiry examines the taxpayer's intent in entering into a transaction and looks for indications of legitimate motives other than tax avoidance.

---

[7] We need not decide whether, as taxpayers suggest, a sham is demonstrated *only* when *both* prongs of the test are proved, because — the tax consequences of the transaction aside — we find both lack of business purpose *and* lack of economic substance in this case.

*Bail Bonds By Marvin Nelson, Inc. v. C.I.R., supra,* 820 F2d at 1549; *Rice's Toyota World, Inc. v. C.I.R., supra,* 752 F2d at 92. Federal courts scrutinizing business purpose have considered the investor's testimony regarding motive, the extent to which the investor had sufficient experience with the particular type of transaction to assess the tax-independent value of the transaction, the extent to which the investor directly investigated or sought expert advice as to the tax-independent value of the investment, the extent to which investment literature stresses tax-independent value, and the extent to which an inflated purchase price financed by nonrecourse debt suggests an intent to abandon the transaction after the tax benefits have been realized. *Rice's Toyota World, Inc. v. C.I.R., supra,* 752 F2d at 92-93; *Casebeer v. C.I.R.,* 909 F2d 1360, 1364 (9th Cir 1990).

■ Applying the business-purpose part of the test to the facts of the Morgan/Bakersfield transaction, we find that taxpayers in this case had no business purpose other than tax avoidance. First, although all taxpayers who testified before the Tax Court stated that they were motivated to invest in the Morgan/Bakersfield transaction, at least in part, by a belief that they could make a profit from the investment in the long run, their testimony is not dispositive. *See Shriver v. C.I.R., supra,* 899 F2d at 726 (approving tax court opinion giving little weight to the taxpayer's testimony on motive). Second, none of the taxpayers who testified described any experience that would assist in evaluating the worth of a commercial property transaction such as this one. Third, nothing in the record suggests that any of the taxpayers investigated the transaction's potential value, other than its value as a tax shelter. Some of the taxpayers sought further information and advice after reading the Bakersfield promotional materials and before investing, but we find no indication in the record that those inquiries focused on the tax-independent value of the Bakersfield investment.

Fourth, the Bakersfield promotional materials stress the tax benefits that the transaction would yield. The most important of those materials, the Bakersfield investment memorandum, states that only persons who expect to have 1982, 1983, and 1984 taxable income of at least $6,000, $24,000, and $27,000, respectively, which will be subject to

combined federal and state income tax at a rate of 49 percent for each unit purchased, would be allowed to invest. The memorandum later states that the benefits of losses during the early years of operation will accrue only to investors "receiving continued income taxable at high rates from other sources." The memorandum repeatedly warns of the risk of tax non-deductibility, but barely mentions other types of risks inherent in the transaction. The financial projections appended to the memorandum are arranged to emphasize the tax benefits of the transaction. On the whole, discussions of the tax consequences of the investment dominate the entire document.

Finally, the structure of the transaction itself leads almost inevitably to the conclusion that taxpayers intended to abandon the transaction after its tax benefits were exhausted. Because Bakersfield financed the purchase primarily with non-recourse debt, no assets of the partnership or its members were placed at risk. At the same time, taxpayers were not immediately building any real incentive to hold the properties in the form of equity. That is so because of the negative amortization schedule on the nonrecourse note used to pay for the properties, which prevented taxpayers from acquiring any significant equity in the properties until after 1996, and because of the inflated price that taxpayers paid for the property.[8] The transaction's tax benefits would be exhausted after a few years, and taxpayers would be able to walk away from their investment at that point without losing equity or otherwise incurring financial disadvantage. We infer from those facts that the Bakersfield partnership intended to exploit the investment for its tax advantages and to abandon it thereafter.

In sum, we find that taxpayers intended to utilize their investment in the Bakersfield sale and leaseback transaction only for the purpose of tax avoidance.

## ECONOMIC SUBSTANCE

■■    We turn next to the economic substance portion of the test for a sham sale and leaseback transaction. We are called on to determine whether, objectively, there was any

---

[8] An inflated purchase price is relevant, because payments on principal of a purchase price "yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value." *Estate of Franklin v. C.I.R.*, 544 F2d 1045, 1048 (9th Cir 1976).

reasonable possibility of profit from the transaction other than its tax benefits. *Rice's Toyota World, Inc. v. C.I.R., supra,* 752 F2d at 94; *Bail Bonds by Marvin Nelson, Inc. v. C.I.R., supra,* 820 F2d at 1549. Like the Tax Court, we find that there was not.

When Bakersfield bought the properties from Morgan, it purchased the rights to the user rents and the titles to the property. Any value attributable to the *use* of the property was tied up in long-term renewable user leases. Thus, any gain that Bakersfield could expect from the transaction would have to derive from the stream of rental income from the properties or from the properties' residual (resale) value.

The Department asserts that the combined residual and rental income value of the four properties in 1982 was the price paid by Morgan ($2,576,157) in what the Department deems to be an arm's-length sale properly reflecting true market value. Based on that figure, the Department estimates that the 1982 "present value" of the investment as a whole to Bakersfield was $2,407,308.[9]

If we accept the Department's figures, taxpayers could not reasonably have expected to make a profit on their $4,350,002 investment. Taxpayers contend, however, that the Morgan purchase price does not reflect the investment's true value and that the properties were in fact worth almost $5 million in 1982. They further submit that, because the properties inevitably will increase in value due to inflation and rising land values, they have a reasonable expectation of realizing a substantial profit when they sell the properties.

We find that the Morgan price provides the best available estimate of the properties' 1982 "present value" in this record. That price was paid in an arm's-length transaction; the Bakersfield price, paid in a transaction between two partnerships with strongly related general partners,[10] was not.

---

[9] The Department calculated the 1982 "present value" of the investment to Morgan at $2,986,771. The difference is due to the fact that Morgan's cost of borrowing differed from Bakersfield's.

[10] The three shareholders in Morgan's general partner, F.D.& D. Corporation, were also the partners who made up Fuhrer, Dunn & Doerr, Bakersfield's general partner.

In addition, the evidence offered by taxpayers to justify the high price paid by Bakersfield is unpersuasive. The Merrill Lynch appraisal on which taxpayers rely does not provide an independent assessment of the stores' fair *market* value, but instead evaluates the *investment* value of the transaction. We also find that taxpayers' contention that Morgan paid a below-market price, because it purchased in volume and was able to come up with ready cash, is not credible. We do not believe that a prudent business person would sacrifice nearly one-half of a property's potential price in exchange for such benefits.

Furthermore, we do not believe that Bakersfield ever had a reasonable expectation of realizing the extremely optimistic increases in the value of the properties that it claims were inevitable at the time of the purchase. The high degree of control retained by the users under the user leases necessarily would be reflected in the purchase price in any sale, even if the users never exercise their contractual right to purchase the stores at fixed prices under certain conditions. The long-term, below market rents called for in the user leases would tend to depress the value of the properties that they encumber, as long as the leases are operative. So much of the properties' value is reserved to the users by the strong protections in the user leases that the users, rather than the investors, stand to gain from any increase in property values.

The 1990 sale of one of the stores is an example. In an uncompelled sale of one of the leased stores to the user, Bakersfield received several hundred thousand dollars less than Bakersfield paid for the same property in 1982. Assuming that the property increased in value during the eight years that Bakersfield held title, it was the user, rather than Bakersfield, who captured that increase.

Only in the unlikely event that the users abandoned the properties would Bakersfield be able to sell them for fair market value. Bakersfield could not reasonably have expected to reap any real economic benefit from an increase in the residual market value of properties that were encumbered with user leases that so strongly protected the interests of the lessees.

Neither is the income stream to Bakersfield from the Morgan/Bakersfield wrap-lease an economic benefit to Bakersfield. Although Bakersfield purportedly would receive payments from Morgan under the wrap-lease, the value of the scheduled wrap-lease payments bears no relationship to the actual value of the rents derived from the properties.[11] Because the wrap-lease payments are almost exactly offset by the note payments, the wrap-lease arrangement has no real economic effect on either Morgan or Bakersfield. The arrangement serves only to inflate artificially the value of the right to excess user rents acquired by Bakersfield and to allow Bakersfield to claim higher depreciation and interest deductions. Under the circumstances, we cannot view Bakersfield's income from Morgan's wrap-lease payments as a legitimate basis for taxpayers' claim that they had a reasonable expectation of economic profit from the Morgan/Bakersfield transaction.

For the foregoing reasons, we find that taxpayers never had a reasonable possibility of deriving real economic profit from the transaction at issue and that the transaction was without economic substance.

## CONCLUSION AND REMEDY

■ We conclude that the sale of the four stores to Bakersfield by Morgan and the simultaneous wrap-lease of the stores back to Morgan was a sham. That conclusion does not end our efforts, however, because taxpayers also assign as error the Tax Court's chosen remedy. Taxpayers argue that, rather than disallowing all deductions flowing from the transaction, the Department should have allowed their deductions to the extent that the nonrecourse debt used to finance the transaction does not exceed the fair market value of the properties.

Taxpayers rely on a line of federal cases holding that, when a buyer of property finances the purchase with

---

[11] In fact, Morgan's wrap-lease payments to Bakersfield were higher than the user rent payments that it received. That is, Morgan essentially had a negative income stream from the leaseback arrangement. The only sensible reason for Morgan to place itself in such a negative position (other than to set up a tax shelter) would be to reap the benefits of an expected increase in user rents. But, because the user rents were locked into a below-market rate, which would, in fact, decrease if the users renewed their leases, there is no reasonable basis for such an expectation.

nonrecourse debt, the buyer is deemed to have incurred "genuine indebtedness" only to the extent of the property's fair market value and may depreciate the property only to that extent. *See Pleasant Summit Land Corp. v. C.I.R.*, 863 F2d 263, 273-77 (3d Cir 1988), *cert den* 493 US 901 (1989); *Brannen v. C.I.R.*, 722 F2d 695, 701 (11th Cir 1984); *Odend'hal v. C.I.R.*, 748 F2d 908, 912-14 (4th Cir 1984), *cert den* 471 US 1143 (1985) (all so holding). Some of those cases expressly extend the "genuine indebtedness" requirement to cover interest deductions. *See, e.g., Pleasant Summit Land Corp. v. C.I.R.*, *supra*, 863 F2d at 274; *Odend'hal v. C.I.R.*, *supra*, 748 F2d at 912.

Those cases do not assist taxpayers. Each of them focuses on the effect of nonrecourse debt and fair market value on the bona fides of a claimed *indebtedness*. None contains any discussion of whether the *entire transaction* underlying the debt is a sham entered into solely for the purpose of avoiding taxes.

In contrast, the case at hand concerns the bona fides of an entire transaction — a transaction that involves not only a questionable debt, but also an equally questionable wrap-lease. If we were to disallow taxpayers' deductions solely on the ground that the nonrecourse indebtedness on the Bakersfield investment exceeded the investment's fair market value, we might be more inclined to limit the Department's remedy in the manner that taxpayers suggest.[12] But we have found that the entire Bakersfield investment was a sham. In that situation, the proper remedy is "to ignore the labels applied by the parties and tax the transaction according to its substance." *Rice's Toyota World, Inc. v. C.I.R.*, *supra*, 752 F2d at 95 (summarizing the holding of *Gregory v. Helvering*, 293 US 465, 469-70, 55 S Ct 266, 79 L Ed 596 (1935)).

■　Taxpayers also rely on *Alan J. Levy v. Comm'r*, 62 TCM (CCH) 1636 (1991), for the proposition that the

---

[12] We note, however, that even the courts that have denied deductions on the basis of a lack of "genuine indebtedness" do not all agree that it is proper to allow deductions to the extent of the property's fair market value. *See, e.g., Estate of Franklin v. C.I.R.*, *supra* note 8, at 1049 (interest deduction not justified where absence of personal liability on a debt reduces the transaction in economic terms to mere chance that a genuine debt obligation may arise); *Lukens v. C.I.R.*, 945 F2d 92, 98 (5th Cir 1991) (declining to follow *Pleasant Summit Land Corp. v. C.I.R.*, 863 F2d 263 (3d Cir 1988), *cert den* 493 US 901 (1989)).

appropriate remedy is to allow them to claim their proportionate shares of partnership income (loss), depreciation, and interest to the extent of Bakersfield's basis in the properties. In *Levy*, the Commissioner of Internal Revenue had disallowed the taxpayers' claimed losses, deductions, and investment tax credits relating to an investment in a real estate limited partnership and, as a result, had determined deficiencies in the taxpayers' federal income taxes. The taxpayers petitioned for review.

The United States Tax Court first held that the partnership "had a legitimate business purpose for purchasing the two office buildings and that the limited partners in [the partnership] had a business purpose for investing in the partnership." *Id.* at 1642. The Tax Court then considered whether and to what extent the transaction had economic substance. On that point, the court concluded that a significant "same-day" increase in the selling price of the property was "largely unjustified" and was "not supported by the fair market value." *Id.* at 1643. Because the property was overvalued, the Tax Court regarded the investment "as having economic substance but only to the extent of the fair market value" of the property. *Id.* at 1644. The remainder of the purchase price was "treated as a mere contingent liability." *Ibid.*

Significantly, in *Levy* the court found that the investors had a business purpose and that the transaction had *some* economic substance, albeit not as much as the taxpayers had claimed. This case is different. We have found that the investors had no business purpose and that the transaction had no economic substance. *Levy* does not suggest, and we do not believe, that the remedy used there should apply in the absence of a business purpose and in the absence of some economic substance.

■ The Bakersfield transaction must be taxed according to what it was — a purchase of tax benefits — rather than what it purports to be — an investment in commercial property held for the production of income. Because depreciation deductions are predicated on the existence of a "real" investment in property, *Rice's Toyota World, Inc. v. C.I.R., supra*, 752 F2d at 95, which is used in trade or business or held for the production of income, 26 USC § 167 (1988), taxpayers

may not claim any deductions for depreciation from the transaction.

■        Neither may taxpayers take advantage of the interest deduction that normally is available to taxpayers in business who borrow funds to further that business, because the federal income tax provision allowing for interest deductions, which has been incorporated by reference into the Oregon personal income tax laws,

> "should not be construed to permit an interest deduction when it objectively appears that a taxpayer has borrowed funds in order to engage in a transaction that has no substance or purpose aside from the taxpayer's desire to obtain the tax benefit of an interest deduction." *Goldstein v. C.I.R.*, 364 F2d 734, 741 (2d Cir 1966), *cert den* 385 US 1005 (1967).

*Accord Barnett v. C.I.R.*, 364 F2d 742, 744 n 1 (2d Cir 1966); *Knetsch v. United States*, 364 US 361, 366, 81 S Ct 132, 5 L Ed 2d 128 (1960). *But see Rice's Toyota World, Inc. v. C.I.R., supra*, 752 F2d at 96 (allowing interest deduction on recourse portion of debt incurred in sham transaction).

The Bakersfield transaction had no purpose or substance other than tax avoidance. Therefore, we hold that the Tax Court properly denied all of taxpayers' deductions on their 1982 through 1984 personal income tax returns that were attributable to their investments in that transaction.

The judgment of the Tax Court is affirmed.