IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

MATTHEW D. ORTH                              )
and ELIZABETH D. ORTH,                       )
                                             )
            Plaintiffs,                      )      TC-MD 160075R
                                             )
      v.                                     )
                                             )
DEPARTMENT OF REVENUE,                       )
State of Oregon,                             )
                                             )
            Defendant.                       )      **FINAL DECISION**[1]

        Plaintiffs appeal Defendant's Notice of Assessment, dated March 1, 2016, for the 2011

tax year.  A trial was held in the Oregon Tax Court on October 25 and 26, 2016.  The trial was

consolidated with case TC-MD 160068R for the limited purpose of utilizing common testimony

by expert witnesses.  Justin Heideman of Heideman & Associates, and Karianne R. Conway, of

Gleaves Swearingen Potter & Scott LLP, appeared on behalf of Plaintiffs.  Matthew D. Orth

(Orth), Kevin M. Gregg (Gregg), and Richard Jameson (Jameson) testified on behalf of

Plaintiffs.  Kristen M. Ennis and James C. Strong, Assistant Attorneys General, appeared on

behalf of Defendant.  Plaintiffs' Exhibits 32 to 45, 50, and 89 were admitted without objection.

Plaintiffs' Exhibit 82 was not admitted.  Defendant's Exhibits A to E were admitted without

objection.  Defendant's Exhibits F, G, H, and I were admitted into evidence over Plaintiffs'

objection.  The record was held open for the parties to submit post-trial briefs which were timely

filed.  The record closed on January 11, 2017.

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered November 13, 2017.  The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered.  *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

## I. STATEMENT OF FACTS

Orth testified that he and his spouse are physicians and he is a shareholder of a radiology practice. In 2010, Orth attended a family gathering where his father introduced him to an opportunity to redirect his income taxes from going to the federal government and allow Plaintiffs to direct those dollars towards a solar energy venture.[2] Orth testified he was initially skeptical but followed up with internet research and talked to promoters of the venture who are called Sponsors. The Sponsors explained to Orth how the opportunity worked: an entity known as RaPower3 advertised a revolutionary technological breakthrough in which a series of Fresnel lenses (solar lens) are formed together in a "tree" to create heat which produces steam and results in the production of electricity and purified water. Under the program, a taxpayer can purchase a solar lens for $3,500. Full payment can be made at that time, however, Orth testified that RaPower3 Sponsors suggested that he pay 10 percent of the cost down and bring the payment up to the contract down payment of $1,050 when Plaintiffs receive their tax refund – which is made possible due to a solar energy credit and significant regular and bonus depreciation. The plan calls for the lenses to be rented to a party related to RaPower3 and Plaintiffs will receive $150 per year when the lens starts producing revenue. The taxpayer will receive the full rental income for the first five years, and then the rent is offset by the remaining balance owed for the lenses for the next 30 years. Taxpayers are also eligible for a bonus, in Plaintiffs' case at $6,000 per lens, when RaPower3 generates $1 billion in gross receipts. Taxpayers may also become Sponsors and get a commission on sales in a multi-level marketing program. Orth summarized four ways to make money under the program: tax benefits from accelerated depreciation and

---

[2] The court does not use the term "business" as that is the crux of an issue under dispute. Rather, the court follows the term used by Magistrate Robinson in a prior case involving similar entities, *Gregg v. Dept. of Rev.*, TC-MD 140043C, 2014 WL 5112762 (Or Tax M Div Oct 13, 2014).

solar energy credits; rental income; bonus income when RaPower3 hit the required gross receipts; and commissions if he became a Sponsor and sold lenses. Orth testified that one of the selling points of the venture was the tax benefits. He also based his decision to buy on the commission his father would receive. Orth testified that he obtained a commission as a Sponsor on one occasion but abandoned those efforts after Plaintiffs' taxes were audited by the state.

Orth testified that he put down 10 percent of the cost for 70 lenses in 2011 and brought his payment to $1,050 per lens in 2012. (Ptfs' Ex 89.) Plaintiffs' 2011 return shows their gross income from wages, interest, dividends, and rentals was approximately $450,000. (Def's Ex B at 3.) Plaintiffs filed a Schedule C for the 2011 tax year, showing losses from their "Solar Energy" business, based solely on depreciation of the lenses, in the amount of $163,625. (Def's Ex B at 3, 9.) Plaintiffs also claimed a solar energy tax credit in the amount of $43,015.[3] (Def's Ex B at 4.) Plaintiffs' total federal tax shown on their 2011 return was $3,088 and they requested a refund of $90,820. Plaintiffs' 2011 Oregon tax return claimed depreciation and credit resulting in total tax due of $17,687 and a refund claim of $18,173. (Def's Ex B at 2.)

Orth testified that he understood the lenses would be used for research and development first and then later for production of electricity and clean water. He testified that he knew RaPower3 was in a development process at the time he purchased the lenses and was not operational or producing income. He testified that RaPower3 is currently constructing towers to put up solar lenses based on conference calls with the company and from information contained on the company's website. He testified that his purpose in the venture was to create an income stream over time when rental income was generated and to eventually receive a bonus. Orth testified that he did not form a separate business entity, prepare separate accountings, or

---

[3] The evidence on that figure was unclear. Ex B at 18 shows the credit of $43,015 and Ex B at 23–25 shows a credit of $57,750.

otherwise register his venture with the state. Orth testified that he relies on others to manage his radiology practice. He also testified that neither he nor his spouse has personally managed any other business outside of his solar energy venture. Orth testified that he created a "rough draft" of a business plan but did not make formal income forecasts. Orth testified that the contracts to buy lenses and lease them were all created by RaPower3 or related entities. Plaintiffs engaged Mr. Bolander, a CPA referred by RaPower3, to prepare their taxes and then changed to Jameson when Bolander discontinued his services.

On or about February 2, 2012, Orth received an email from RaPower3 containing a "Placed in Service Document." (Ptfs' Ex 34.) The letter states: "This letter is regarding the 'Alternative Energy Systems' that you purchased from RaPower3 LLC. RaPower3 put into service your equipment on or before December 31, 2011. This will qualify you for the Internal Revenue Services solar energy tax credit." (Ptfs' Ex 35.) Orth testified he has never seen the lenses he purchased, has never visited the RaPower3 site, and has no direct knowledge of the location of the lenses, or if and how they are being used. His only information is from RaPower3 which informed Orth that the lenses are in southern Utah.

Orth testified that a large percentage of his work in the venture consists of reviewing emails and information from RaPower3. Orth viewed prototypes of towers and turbines several times a year on RaPower3's website and participated in conference calls. Plaintiffs' exhibits show examples of conference calls focusing on the infrastructure progress of RaPower3 and promotion of its lens purchasing program. Orth estimated that he received one to two emails per week in 2011 from RaPower3. RaPower3 sent an email to Plaintiffs with the headline "IRS WILL FUND YOUR SOLAR STARTUP" and continues "LOWER TAXES – RAISE PAY – BOOST RETIREMENT[.]" (Def's Ex I-1.) Other emails describe strategies for computing the

number of lenses a prospective taxpayer should buy based on their tax liabilities to reduce them to zero. (Def's Ex I-2 at 1–3.) Orth testified that he understood that if the lenses never generated any income, he would not be liable for the remaining contract balance owed on the lenses.

## II. ANALYSIS

The issues in this case are: (1) whether Plaintiffs' venture was a business, for which deductions are allowed under Internal Revenue Code (IRC) section 162, or an activity not engaged in for profit under IRC section 183; (2) whether the solar lenses were placed into service; (3) whether the venture lacks true economic substance; (4) whether depreciation and energy tax credits claimed in connection with solar lens rentals are limited by the passive activity loss rules under IRC section 469; and (5) whether Plaintiffs' deductions are limited by the at risk limitations under IRC section 467.

In analyzing Oregon income tax cases, the court starts with several general guidelines. First, the court is guided by the intent of the legislature to make Oregon's personal income tax law identical in effect to the IRC for the purpose of determining taxable income of individuals. ORS 316.007.[4]  Second, in cases before the court, the party seeking affirmative relief bears the burden of proof and must establish his or her case by a "preponderance" of the evidence. ORS 305.427.  Third, allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992).

In this case it is important to identify the matters that are not at issue. First, although this court will discuss plans, contracts, and communication Plaintiffs had with RaPower3 and its related entities, the court will not and cannot decide the legitimacy of those entities. RaPower3

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

was not a party to the action, and although indirectly invited to present testimony, they did not participate in the case. Second, although Defendant's unstated theme of the case was that the solar energy venture represented an abusive tax shelter, that term will not be analyzed here as it has different legal consequences under the IRC and the facts were insufficient to warrant such an analysis in this case. (*See* IRC § 6700).

A.      *Business venture or not for profit activity?*

Under IRC section 162(a), a deduction is allowed for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" The code and regulations preclude deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in IRC section 183. Treas Reg § 1.183-2(a). If the activity is not engaged in for profit, expenses may be deducted under IRC section 183 only to the extent of any profits. *Gallo v. Dept. of Rev.*, TC-MD 011022F, WL 21675927 at *3 (July 8, 2003).

"In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination." Treas Reg § 1.183-2(b). The nonexhaustive list of factors to be considered by the court are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort the taxpayer expends; (4) the expectation that assets may appreciate in value; (5) the taxpayer's success in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. *Id*. Taxpayer's actions may be deemed "for profit" when the "predominant, primary or principal objective" for engaging in the

activity was to realize an economic profit independent of tax savings. *McMillan v. Comm'r*, 105 TCM (CCH) 1263, 4 (US Tax Ct 2013).

    1.     *Businesslike manner*

Actions are conducted in a "businesslike manner" when they are executed with the intent to make a profit and may include, but are not limited to: maintaining complete and accurate books or records of trade or business; behaving according to industry standards; changing or adjusting trade or business techniques to increase the probability of making a profit; and abandoning unprofitable trade or business methods in order to increase the probability of making a profit. Treas Reg §1.183-2; *Betts v. Comm'r (Betts)*, 100 TCM (CCH) 67 (2010), 2010 WL 2990300 at *6.

Plaintiffs argue that they are in the business of leasing solar lenses, which were manufactured and purchased from RaPower3. Although RaPower3 is the manufacturer and seller of the lenses, Orth testified that RaPower3 was not the lessee of their solar lenses. Plaintiffs presented no evidence of a contract made between them and another party.[5] Plaintiffs presented no documentation showing specific identification of their lenses, when they were to be used, or in what exact location. The evidence was lacking to show that Plaintiffs' actions were consistent with the industry standard. The evidence does not contain any information that Plaintiffs could have utilized to consider or make adjustments to their leasing activities. The court finds that factor (1) weighs against Plaintiffs.

/ / /

/ / /

/ / /

---

[5] Plaintiffs filed many documents with the court before trial, but did not offer most of them as evidence.

2. *Expertise of the taxpayer*

"The main inquiry is whether [Plaintiffs] received advice from the experts as to the accepted principles and economics of profitably running a business * * *." *Betts*, 2010 WL 2990300 at *8 (citations omitted).

Plaintiffs' research, as well as knowledge of the solar industry and the business of leasing solar panels, was limited to information acquired via RaPower3's website. RaPower3, however, is not in the business of leasing solar lenses. Therefore, it cannot be assumed that just because Plaintiffs explored RaPower3's website that they engaged in research related to the business of leasing solar lenses. Plaintiffs did not consult with any experts other than tax experts referred to them by RaPower3 and they did not possess their own expertise. Factor (2) weighs against Plaintiffs.

3. *Time and effort of the taxpayer*

As noted above, the time Plaintiffs spent reviewing RaPower3's website or webinars was unrelated to any efforts that would result in greater or lesser profitability. Time spent in actually performing any work on the business of leasing tangible items was de minimis. Therefore, that factor weights against Plaintiffs.

4. *Expectation that assets would appreciate*

Orth testified he believed his solar lenses would appreciate in value. However, other than that conclusory opinion, no evidence was presented in support of that contention. Plaintiffs did, and intended to continue, to depreciate the lenses, which indicates that the lenses were aging and moving toward a general state of obsolescence. Therefore, that factor weighs against Plaintiffs.

/ / /

/ / /

5.      *Success in similar activities*

"[A] taxpayer's previous success in similar activities may show that the taxpayer has a profit objective even though the current activity is presently unprofitable.  A taxpayer's success in other, unrelated activities also may indicate a profit objective." *Storey v. Comm'r*, 103 TCM (CCH) 1631, 2012 WL 1409273 at *11 (citations omitted).

Orth is successful in his medical practice.  However, he testified that he relies on others for business operations of his practice.  The evidence does not suggest that Plaintiffs applied the experience they gained from operating their medical practices to their leasing operations.  Plaintiffs did not show success in any other business or activity similar to their solar venture.  Factor (5), therefore, weighs against Plaintiffs.

6.      *History of income and losses;*
7.      *Amount of occasional profits*

Factors (6) and (7) instruct the court to consider the general profits and losses from Plaintiffs' leasing activity.  Treas Reg § 1.183-2(b)(6), (7).  Plaintiffs, however, have never earned any money from their leasing activities and by their own testimony were not likely to earn any income for many years.  Factors (6) and (7), therefore, weigh against Plaintiffs.

8.      *Financial status of the taxpayer*

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Treas Reg § 1.183-2(b)(8).

Plaintiffs received significant income from their activities in the medical profession.  If not for their income from employment they would have been unable to sustain their investment in the solar venture.  In 2011, Plaintiffs paid a relatively small amount of taxes on more than

$450,000 in gross income as a result of the deductions related to the solar venture. That factor weighs against Plaintiffs.

9. *Element of personal pleasure*

A large percentage of IRC section 183 cases in Oregon involve farming activities that are associated with recreation or personal elements. In this case, none of those elements are present. That factor weighs in favor of Plaintiffs.

Weighing the totality of the evidence against the nine factors, the court finds that the Plaintiffs did not conduct themselves in a businesslike manner and that their actions do not suggest an underlying profit motive.

B.  *Were the lenses placed into service?*

IRC section 167(a) provides a depreciation deduction for assets held for the production of income. IRC § 167(a)(2). Depreciation may be taken for the asset when it is placed in service. Treas Reg § 1.167(a)-10(b). An asset is placed in service when it is "first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income[.]" Treas Reg 1.167(a)-11(e)(1)(i). That regulation also states "[i]n general, the provisions of paragraph (d)(1)(ii) and (d)(2) of § 1.46-3 shall apply for the purpose of determining the date on which property is placed in service * * *." *Id*. Treasury Regulation 1.46-3(d)(2)(iv) states "materials and parts acquired to be used in the construction of an item of equipment shall not be considered in a condition or state of readiness and availability for a specifically assigned function."

Plaintiffs' arguments can generally be categorized in two ways – factual and legal. They argue that as a factual matter the lenses were placed into service. For that proposition they rely on the letter from RaPower3, dated February 2, 2012, which recited that fact. Plaintiffs argue

that by putting evidence forward the burden of proof then shifts to Defendant, and because no rebuttal evidence was offered, they should prevail. (Ptfs' Closing Br at 8, fn 6.) However, the only evidence supporting Plaintiffs' position is a nonspecific hearsay document prepared by a company that has an indirect interest in the outcome of this case and the many others like it, and by Orth's testimony that the company told him the lenses were placed into service. Plaintiffs did not present competent evidence that the lenses actually existed or that specific lenses were or could be identified in any way. Even if the lenses existed and could be identified, the evidence did not reveal where they were or how, or if, they were being used. The burden does not shift to Defendant because Plaintiffs did not present sufficient evidence to show by a preponderance of the evidence that the lenses were placed into service.

Plaintiffs also argue that the lenses should be considered placed in service regardless of the production of solar energy because they are in the business of leasing the lenses to produce heat. The court disagrees with that proposition. Orth testified that he would receive rental income, and potential bonuses, when RaPower3 produced income. That income is not created by the production of heat alone – it requires the lenses to be part of a process to produce either electricity or clean water. Those resulting items were necessary to produce revenue, which is what this venture is all about. In *Consumer Power Co. v. Comm'r*, 89 TC 710 (1987), the court found that testing of the water pumps and the generation of some electrical power were not sufficient, and a power plant was not available until it "successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis." *Id*. at 724. In *Public Service Co. of N.M. v. United States*, 431 F2d 980 (10th Cir 1970) the court observed:

/ / /

> "No one of these [component assets] would serve any useful purpose to [Public Service Co.] but all of them properly fitted together by the contractor, together with the building, constituted a complete unit which was operational and served the purpose intended by [Public Service Co.]. It was this complete operational unit that [the contractor] agreed to construct from the many components and deliver to [Public Service Co.] as an electrical power generating plant."

*Id.* at 984.

Component parts should be viewed as one integrated unit. *Hawaiian Independent Refinery, Inc. v. United States*, 697 F2d 1063 (Fed Cir), *cert den*, 464 US 816 (1983). It would be wrong to say a solar lens was placed into service for generating income when the lens was only part of a whole that was not ready to create the product to generate business revenue. Based on the evidence presented in this case, Plaintiffs' lenses had not been placed into service and they cannot be depreciated during the tax year in issue.

C.      *Does the solar lens venture lack real economic substance?*

On this issue, the parties focused on the sale-leaseback aspect of the solar lens venture. Plaintiffs rely on *Frank Lyon Co. v. United States (Frank Lyon)*, 435 US 561 (1978) for support that the main factor legitimizing a sale-leaseback transaction is the economic significance of the buyer/lessor's investment. (Ptfs' Trial Mem at 1–2; Ptfs' Closing Arguments at 7.) Defendant asserts that "tax benefits are disallowed if the transaction that produces those benefits lack economic substance or a valid non-tax business purpose." (Def's Post-trial Br at 13, citing *Baisch v. Dept. of Rev*. (*Baisch*), 316 Or 203, 210–11, 850 P2d 1109 (1993)).

In *Frank Lyon*, Worthen Bank (Worthen) intended to finance a new building through a traditional mortgage but was impeded by several state and federal regulations. *Id.* at 563–64. The regulatory authorities approved Worthen's proposition to finance the building through a sale-leaseback transaction instead. *Id.* at 564. Worthen received a proposal from New York Life Insurance to provide an amount of permanent mortgage financing conditioned upon its approval

of the titleholder to the building. *Id.* All parties including the regulators then approved Frank

Lyon Co. as the borrower-lessor and construction began. *Id.* at 565. City Bank agreed to lend

Frank Lyon Co. $7 million for the construction of the building, which was secured by a mortgage

on the building and an assignment of Frank Lyon Co.'s interest in the lease. *Id.* at 567. New

York Life agreed to purchase that secured note upon completion of the building, conditioned

upon Frank Lyon Co.'s agreement that it would lease the building to Worthen for a minimum

amount of time and that the rent would be at least equal to the mortgage payments on the note.

*Id.* at 568. Worthen sold the building to Frank Lyon Co., which then rented it back to Worthen.

*Id.* at 565–66. The lease was a "net lease" in which Worthen was responsible for all building

maintenance, and the total rent equaled the principal and interest that would amortize the New

York Life mortgage. *Id.* at 566. Frank Lyon Co. was audited after deducting interest payments

to New York Life and City Bank and depreciation for the building. *Id.* at 568. The

Commissioner asserted that Frank Lyon Co. was not the owner of the building for tax purposes

and not entitled to such deductions. *Id.* He argued that Frank Lyon Co. was simply a "conduit"

for the mortgage payments made by Worthen in the form of rent. *Id.* at 573.

The Supreme Court formulated its rule for determining whether a sale-leaseback

transaction represents more than a sham transaction:

> "[W]here there is a genuine multiple-party transaction with economic substance
> which is compelled or encouraged by business or regulatory realities, is imbued
> with tax-independent considerations, and is not shaped solely by tax-avoidance
> features that have meaningless labels attached, the Government should honor the
> allocations of rights and duties effectuated by the parties."

*Id.* at 583–84, 98 S Ct at 1303–04.

The Court reiterated its doctrine of substance over form for tax cases, and listed 26 facts

of the transaction that were the basis of its conclusion that the transaction had economic

substance as well as form. *Id.* at 572–73, 582–83. The Court found it significant that Frank Lyon Co. alone was liable on the notes to City Bank and New York Life should anything go wrong with the lease, and also that Frank Lyon Co. had to disclose the long-term debt on its public balance sheets, which significantly affected its ability to obtain financing for its other business needs. *Id.* at 576–77. The Court also found significant the fact that Worthen could not engage in the simpler mortgage financing that the Commissioner insisted on, due to regulatory restraints. *Id.* at 577–78. Further, the Court found that Frank Lyon Co. would be taking a serious risk regarding the building's worth if Worthen did not choose to utilize its repurchase option at the end of the lease. *Id.* at 579. The Court noted that the Government did not lose significantly more money from Frank Lyon Co. taking the deductions than if Worthen had, instead, taken the deductions under a traditional mortgage. *Id.* at 580. The Court held that Frank Lyon Co. was entitled to the deductions because it was the company's capital, not Worthen's, which was committed to the building. *Id.* at 581.

In *Baisch*, the Oregon Supreme Court expressly followed the *Frank Lyon* holding but observed, "Lower federal courts have drawn from that statement a two-part test: A sale and leaseback transaction is a sham if there is (1) no business purpose other than tax avoidance and (2) no objective economic substance beyond the creation of tax benefits." *Baisch,* 316 Or at 211 (citations omitted). Although the court found that the two-part test is consistent, but not required for the *Frank Lyon* holding, the court employed the two-part test in *Baisch*. *Id.* First, the court noted that the "business purpose" test looks at a taxpayer's legitimate intent for entering into the transaction other than tax avoidance. The court looks at the experience of the taxpayer, the amount of investigation or use of expert advice, what the investment literature stressed, and the true risks of the taxpayer. *Id.* at 211–12.

Applying the business purpose test to this case, the court finds that Plaintiffs' main motivation was tax avoidance. Testimony by Orth and Gregg both suggested that tax benefits were a significant factor in investing in the venture, along with helping family members who were Sponsors of RaPower3. Plaintiffs did not have any experience that would help them evaluate the economics of the transaction. Gregg's background as a journeyman electrician may have assisted his ability to evaluate the possibility of producing solar power, but would not have given him any knowledge on the economics of the transaction. Plaintiffs did not perform any meaningful investigation into the transaction. The promotional material and conference calls presented by RaPower3, upon which Plaintiffs relied, focused almost exclusively on the tax benefits of the transaction. Indeed, the suggested amount of investment was proposed exclusively in direct proportion to the tax position of the investor.

The structure of the transaction also supports the finding that the primary investment motivation was tax savings. Plaintiffs obtained immediate and accelerated depreciation and energy credits that far exceeded their initial down payment and the RaPower3 literature instructed investors to use their tax savings to complete their down payment. Plaintiffs were not required to make any further payments until and unless rental income was received. Even then, payments on the balance of the purchase price were to be taken out of rental income after five years of payment. Further, Orth stated his belief that repayment of the balance was not actually required – indicating that the transaction was actually nonrecourse despite other testimony to the contrary. Plaintiffs in this case did not face the types or level of financial risk as seen in *Frank Lyon*.

The second of the two-part test in *Baisch* examines "whether, objectively, there was any reasonable possibility of profit from the transaction other than its tax benefits." *Id*. at 213–14

(citations omitted). Certainly, the testimony from Plaintiffs' witnesses formed a foundation that the parties maintained a subjective belief in the potential profitability of the venture. Objectively, however, the evidence was lacking. The evidence presented consisted of hearsay provided by RaPower3 by and through the witnesses. There was little direct information provided upon which the court could determine the probability of a profit. Testimony that the technology involved was revolutionary was not persuasive and Gregg's testimony on that point lacked substantial foundation.

The entire structure of the venture appears to be a mirage of a real business. The transaction appears to go through the motions in an attempt to make it appear that it is intended as a profitable business. The "placed in service" letter and purported management activities, which are little more than reviewing a multi-level marketing promotion of RaPower3's business, appear to be placeholders rather than actual business activities. When viewed as a whole, Plaintiffs' use of the sale-leaseback transaction was objectively for the purpose of tax avoidance and lacked real economic substance.

D.     *Do passive activity loss limitations apply*?

Defendant argues that Plaintiffs' solar lens depreciation and solar energy investment credits should be disallowed because they result from a rental activity in which Plaintiffs did not materially participate. Defendant further argues that rental activity is presumptively passive. Plaintiffs respond that their solar lens rental activity was not passive and that they materially participated in the venture. "Passive activities fall into the following two categories: (1) any trade or business in which the taxpayer does not materially participate; and (2) any rental activity, whether or not the taxpayer materially participates." W. Ralph Rodgers, Jr., *Material*

/ / /

*Participation Under the Passive Activity Loss Provisions*, 39 U Fla L Rev 1083, 1087 (1987) (citing IRC section 469(c)(1)-(2)).

1. *Rental income is per se passive*

Except for rental activities of real estate professionals, found in IRC section 469(c)(7), courts have generally held that "[r]ental activity is treated as a per se passive activity regardless of whether the taxpayer materially participates." *Langille v. Comm'r*, 99 TCM (CCH) 1197 (2010), 2010 WL 1009979 at *13 (citing IRC § 469(c)(2), (4)). Rental activity is defined in IRC section 469(j)(8) as "any activity where payments are principally for the use of tangible property." The temporary Treasury Regulation section 1.469-1T(e)(3) adds that an activity is rental activity if:

> "(A) During such taxable year, tangible property held in connection with the activity is used by customers or held for use by customers; and (B) The gross income attributable to the conduct of the activity during such taxable year represents (or, in the case of an activity in which property is held for use by customers, the expected gross income from the conduct of the activity will represent) amounts paid or to be paid principally for the use of such tangible property * * * ."

The Treasury Regulation contains a few exceptions to that rental activity test, including rental activity that is incidental to a nonrental activity or accompanying extraordinary personal services by the owner of the property, and property that is rented by customers for an average of seven days or less. Treas Reg § 1.469-1T(e)(3)(ii). Rental activity can also be considered active if the taxpayer owns an interest in such trade or business and if the property was predominantly used in such trade or business during the taxable year (or during at least two of the last five taxable years that immediately precede the taxable year). *Tarakci v. Comm'r*, 80 TCM (CCH) 727 (2000), 2000 WL 1727374 at *5. None of those exceptions apply in this case.

/ / /

Plaintiffs argue that they are in the business of leasing tangible personal property, and not in the business of solar energy production or advertising. (Ptfs' Closing Arguments at 4–5.) Because Plaintiffs are involved in the rental business, the material participation test laid out in Treasury Regulation 1.469-5T is inapplicable. IRC § 469(c)(4). IRC section 469 states that all personal property rental activity is passive regardless of material participation; thus, Plaintiffs' rental business activities are passive. IRC § 469(c)(2), (4). IRC section 469 disallows the deduction of aggregate losses from passive activities that exceed aggregate income from passive activities, allowing such losses to be carried forward to the next tax year. IRC § 469(a), (b), (d)(1). Plaintiffs claimed a depreciation deduction in 2011 for the Fresnel lenses; however, they reported no rental income for that year. The passive loss rules of IRC section 469 prohibit the depreciation deductions and energy credits that Plaintiffs took in 2011, because of the lack of rental income.

2.      *Material participation*

Despite the clear general rule that rental activity is *per se* passive, some courts have analyzed taxpayers' active participation argument. (*See Lum v. Comm'r*, 103 TCM (CCH) 1557 (TC 2012), 2012 WL 1193182). In general, a passive activity is a trade or business in which the taxpayer does not materially participate. IRC § 469(c)(1). A taxpayer materially participates in an activity when he or she is involved on a regular, continuous, and substantial basis. IRC § 469(h)(1). Participation generally means all work done in connection with an activity by an individual who owns an interest in the activity. Treas Reg § 1.469-5T(f). A taxpayer can establish material participation by satisfying any one of seven tests provided in the regulations. Treas Reg § 1.469-5T(a). Plaintiffs assert that "taxpayer does substantially all the work in the activity." (Ptfs' Closing Arguments at 13, citing Treas Reg § 1.1469-5(a)(2).) That claim is not

persuasive. RaPower3 and its related companies fabricated the lenses and created the marketing program to sell and lease-back the lenses. Plaintiffs kept no accounting and undertook no management or marketing tasks. Their only participation was review of RaPower3 website updates. Plaintiffs' participation did not constitute substantially all of the work in the business of leasing the lenses. The court concludes that Plaintiffs did not materially participate in the solar lens venture during the tax year at issue and that it was a passive activity under IRC section 469(c)(1).

E.      *Do at risk limitations apply?*

IRC section 465 limits the deductibility of losses allocable to certain activities to the amount for which the taxpayer is at risk. IRC § 465(a)(1)(B). One such activity is the leasing of any IRC section 1245 property. IRC § 465(c)(1)(C). Personal property that "is or has been property of a character subject to the allowance for depreciation provided in section 167" is considered section 1245 property. IRC § 1245(a)(3)(A). The amount a taxpayer is at risk regarding an activity includes 1) the amount of money contributed by the taxpayer to the activity, and 2) amounts the taxpayer has borrowed with respect to the activity. IRC § 465(b)(1)(A), (B). Borrowed amounts are those of which the taxpayer is "personally liable for the repayment." IRC § 465(b)(2)(A).

The Third Circuit explained in *Nicholson v. Comm'r (Nicholson)* that IRC section 465 was enacted to stop taxpayers from taking large losses against ordinary income through a combination of accelerated depreciation and the deduction of interest on nonrecourse debt. 60 F3d 1020, 1026 (3rd Cir 1995) (*superseded* by an amendment to a burden of proof statute, IRC § 7430(c)(4)(B)). Taxpayers are not at risk "with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar

arrangements[.]" IRC § 465(b)(4). "The majority of * * * courts have applied the 'economic reality' test to determine whether a taxpayer is protected from loss by 'other similar arrangements.' " *Nicholson*, 60 F3d at 1027. Under that test, taxpayers are not at risk if the transaction removes "any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." *Id.* (citing *American Principals Leasing Corp. v. United States*, 904 F2d 477, 483 (9th Cir 1990)).

Assuming Plaintiffs' claim that they are in the business of renting solar lenses is found (despite a lack of rental agreements or other convincing evidence), their rental activities would fall under IRC section 465, because the lenses are depreciable property. In such case, Plaintiffs are only at risk for the $1,050 that they paid for each lens. There is insufficient evidence to determine whether Plaintiffs are at risk for the purported remaining price of the lenses. Plaintiffs testified about the lens purchase agreement with RaPower3 but did not admit it into evidence. Further, Orth testified that he did not think there would be any recourse by RaPower3 if Plaintiffs did not fulfill their alleged agreement to pay the rest of the lens purchase price through the rental income. The court does not have sufficient evidence to determine whether RaPower3 has recourse against Plaintiffs should they fail to pay the remaining price for the lenses with their rental income. After computing the depreciation and energy credits, Plaintiffs deducted more than the amount of their potential investment. Thus, pursuant to IRC section 465, Plaintiffs may not deduct losses in excess of income from the venture for the 2011 tax year.

### III. CONCLUSION

After careful consideration, the court concludes Plaintiffs were not eligible to deduct depreciation and solar energy credits from their income for the 2011 tax year pursuant to ORS sections 162 and 183. The court also concludes that Plaintiffs are not eligible for the

deductions because they did not meet their burden of proof that the solar lenses were placed into service during the 2011 tax year, because the venture lacked true economic substance, and that any deductions are eliminated by the passive activity loss and at risk limitation rules. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of November, 2017.

_____
RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on November 30, 2017.*